UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

────────────────────────────

JAZBIR SINGH, TEZBIR SINGH, an
infant under the age of eighteen, by his
father and natural guardian, AMARJIT
SINGH, and AMARJIT SINGH,
individually,

                         Plaintiffs,

          – against –

SACHEM CENTRAL SCHOOL
DISTRICT, PATRICIA TROMBETTA,
COLLEEN FLANAGAN, SUFFOLK
COUNTY POLICE DEPARTMENT, ST.
CATHERINE OF SIENA MEDICAL
CENTER, POLICE OFFICER
KIMBERLY DONO, POLICE OFFICER
JAMES TOBIN, POLICE OFFICER
THEODORE LAMONICA, POLICE
OFFICER KRISTOPHER CHARUBIN,
POLICE OFFICER TULIO SERRATA,
DETECTIVE KEITH SINCLAIR,
DETECTIVE DANIEL PAGANO,
DETECTIVE ANTHONY GIGLIOTTI,
and SERGEANT MATTHEW LUNDIN,

                         Defendants.

────────────────────────────

**MEMORANDUM & ORDER**

20-CV-00146 (ERK) (LKE)

KORMAN, *J.*:

Plaintiffs Amarjit Singh, Tezbir Singh, and Jazbir Sing bring this action under

42 U.S.C. § 1983 and state law against Defendants Sachem Central School District,

Patricia Trombetta ("Principal Trombetta"), Colleen[1] Flanagan ("Assistant Principal Flanagan"), Suffolk County Police Department, St. Catherine of Siena Medical Center ("St. Catherine's"), Police Officer Kimberly Dono, Police Officer James Tobin, Police Officer Theodore Lamonica,[2] Police Officer Kristopher Charubin, Police Officer Tulio Serrata, Detective Keith Sinclair, Detective Daniel Pagano, Detective Anthony Gigliotti, and Sergeant Matthew Lundin.    School District Defendants,[3] County Defendants,[4] and St. Catherine's now separately move for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendants' motions are granted as to Plaintiffs' federal claims and the claims for assault and battery and prima facie tort.  I decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, and thus the remaining state law claims are dismissed without prejudice.

---

[1] The record of the case includes references to both "Colleen" and "Coleen" Flanagan.  This order refers to this Defendant as "Colleen" for consistency with the case caption.

[2] The record of the case includes references to Theodore "Lamonica" and "Lomonaco."  This order refers to this Defendant as "Lamonica" for consistency with the case caption.

[3] Sachem Central School District, Principal Trombetta, and Assistant Principal Flanagan are collectively referred to as the "School District Defendants."

[4] Suffolk County Police Department, Police Officer Kimberly Dono, Police Officer James Tobin, Police Officer Theodore Lamonica, Police Officer Kristopher Charubin, Police Officer Tulio Serrata, Detective Keith Sinclair, Detective Daniel Pagano, Detective Anthony Gigliotti, and Sergeant Matthew Lundin are collectively referred to as the "County Defendants."

## I.     Background

### A.     Factual Background[5]

Jazbir and Tezbir are brothers, and Amarjit is their father.[6]  ECF No. 77 ¶¶ 15–16.  At the time of the events underlying this suit, Jazbir was sixteen years old and an eleventh-grade student at Sachem North High School.  *Id.* ¶ 18.  Tezbir was fourteen years old and a ninth-grade student at Sachem North High School.  *Id.* ¶ 17.

On January 7, 2019, Principal Trombetta, principal of Sachem North High School, was informed that a student at Sachem North High School had received an image on her cell phone via AirDrop[7] that appeared to show two guns on a table with the caption: "Don't come to school tomorrow" (the "AirDropped Image").  *Id.* ¶ 2; *see also* ECF No. 75-5.  The student had received the image from someone who

---

[5] The facts stated herein are taken from the parties' summary judgment papers and attached exhibits and are undisputed except as otherwise noted.  As Plaintiffs correctly note, St. Catherine's failed to provide citations to specific evidence in the record to support many of the factual assertions in its Rule 56.1 Statement of Material Facts, as required by Local Civil Rule 56.1(d).  *See* ECF No. 76-6 at 1.  Nevertheless, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001).  Because it appears that Plaintiffs were able to respond to St. Catherine's Statement of Material Facts and because the Court was able independently to review the underlying record, I will accept St. Catherine's Statement of Material Facts despite its failure to comply with the local rule.

[6] For clarity, this order refers to Jazbir Singh, Tezbir Singh, and Amarjit Singh by their first names.

[7] According to the parties, "an 'AirDrop' is when a person uses an iPhone to send photos (or other documents) to others using Bluetooth."  ECF No. 77 ¶ 4.

appeared to have the name "John Marston"[8] while she was on her way home from school on school bus number 12 ("Bus 12") that afternoon.  ECF No. 77 ¶ 2.  The student's mother, upon learning of the incident from her daughter, called Principal Trombetta's office and provided a copy of the AirDropped Image to the school via email.  *Id.*; ECF No. 78-5.  It was later discovered that Tezbir had sent the AirDropped Image to the student.  *See* ECF No. 77 ¶ 58.

After learning about the AirDropped Image, Principal Trombetta contacted the Suffolk County Police Department, the District Superintendent, and the Assistant Superintendent for Student Services.  *Id.* ¶¶ 5, 7; *see also* ECF No. 78-29 ¶ 4.  She also called the school administrative team, which included Assistant Principal Flanagan.  ECF No. 77 ¶ 6.  Assistant Principal Flanagan testified that she was concerned about a school shooting based on the AirDropped Image, *see* ECF No. 76-2 at 77 (76:9–12),[9] and Principal Trombetta likewise indicated that she was concerned for the safety of everyone at the school based on the AirDropped Image, *id.* at 131 (27:10–15).

In response to Principal Trombetta's call, Police Officer Dono notified the Fourth Precinct Crime Section of the incident and went to Sachem North High

---

[8] According to Plaintiffs, "John Marston" is a "fictional character and the protagonist in the Red Dead video game series."  ECF No. 77 ¶ 2.

[9] Citation to ECF pagination followed by internal pagination in parentheses.

School to take a report and statement from the principal.  ECF No. 78-29 ¶ 4; *see also* ECF No. 78-5.  Police Officer Dono also received a roster of students who rode on Bus 12 and a copy of the AirDropped Image from the school.  ECF No. 78-29 ¶ 5.  Police Officer Dono then briefed Sergeant Lundin and Detective Pagano on the situation and gave them the evidence, including the copy of the AirDropped Image, that she had collected at Sachem North High School.  *Id.* ¶ 6.  To further investigate the incident, Detective Pagano attempted to contact the students on the Bus 12 roster.  *Id.* ¶ 8.  He contacted the student whose mother had reported the AirDropped Image and took the student's sworn statement.  *Id.* ¶¶ 8–9; *see also* ECF No. 78-7.  The Suffolk County Police Department did not identify who sent the AirDropped Image on January 7, 2019.  ECF No. 78-29 ¶ 10.

The next morning, on January 8, 2019, Suffolk County police officers, including Detective Pagano and Police Officers Dono and Lamonica, were on-site at Sachem North High School.  *Id.* ¶ 11; *see also* ECF No. 77 ¶ 8.  Security guards employed by Sachem Central School District and Suffolk County police officers directed all the students to enter through the school's front doors, where multiple security guards and police officers were stationed.  ECF No. 78-29 ¶¶ 11–12; ECF No. 77 ¶ 12.  When Bus 12 arrived, the school administrators brought the students on the bus to the school's "little theater."  ECF No. 77 ¶ 13.  Jazbir and Tezbir rode on Bus 12 and were among this group of students directed to the little theater.  *Id.* ¶ 14.  Detective Pagano, and potentially additional security guards, were also in the

5

little theater.  *See* ECF No. 78-29 ¶ 13; ECF No. 78-21 at 21:18–22:5.  Principal Trombetta told the students in the theater about the AirDropped Image and asked the students to speak up if they had any information about the image.  ECF No. 77 ¶ 19. None of the students came forward with any information, and Principal Trombetta directed the students to their first period classes.  *Id.* ¶¶ 20–21.

The school administrative team decided to continue investigating the incident by speaking with the students from Bus 12 one by one in Principal Trombetta's office.  *Id.* ¶ 22.  Detective Pagano, and potentially other members of the Suffolk County Police Department, was also present in Principal Trombetta's office during this time.  *See* ECF No. 78-21 at 24:10–18.  School District Defendants claim that they decided to speak first with students from Bus 12 who they believed had prior disciplinary incidents.  ECF No. 75-3 ¶ 22.  Accordingly, the administrative team first spoke to a student (not Jazbir or Tezbir) who had a disciplinary record.  *Id.* ¶ 23. The school administrators interviewed the student and asked him to show them his cell phone to confirm that he did not have the AirDropped Image.  *Id.* ¶ 23; ECF No. 76-2 at 25 (24:4–23).  After confirming that he did not have the image on his phone, the student was permitted to leave.  ECF No. 77 ¶ 24.

While the team was considering whom to speak with next, Assistant Principal Flanagan recalled that Jazbir had previously been disciplined for drawing a swastika on a classroom whiteboard.  ECF No. 75-3 ¶ 25.  Principal Trombetta and Assistant Principal Flanagan also testified that the police officers in the room recalled that

Jazbir and Tezbir had been involved in an incident in which a bullet was found on a school bus.[10]  *Id.* ¶ 26; ECF No. 76-2 at 22–23 (21:9–22:18), 134–36 (30:19–32:18); ECF No. 75-3 ¶ 26.  Based on these past incidents, the administrative team decided to interview the Singh brothers.  ECF No. 75-3 ¶¶ 25–26.  Plaintiffs acknowledge that Jazbir had previously been disciplined by the school for drawing what was perceived to be a swastika on a classroom whiteboard, but they contend that Jazbir drew this symbol because it is a sign of good luck in India and in his religion, Hinduism.  ECF No. 77 ¶ 25; ECF No. 78-23 at 26:19–20.  Plaintiffs also dispute that Jazbir and Tezbir were involved in an incident with a bullet on a school bus, asserting that there is no record of this incident having occurred.  ECF No. 77 ¶ 26.

Of the Singh brothers, Jazbir was called first to Principal Trombetta's office. *Id.* ¶ 28.  He was escorted from his geometry class to the front office, where Principal Trombetta's office was located, by a school security guard.  *See* ECF No. 78-20 at 30:19–31:17.  Principal Trombetta, Assistant Principal Flanagan, and Detective Pagano, along with other school administrators and potentially other police officers, were present.  *See id.* at 32:3–33:3; ECF No. 78-21 at 27:4–16; ECF No. 76-2 at 28– 29 (27:15–28:18), 137 (33:5–11).  Principal Trombetta asked Jazbir about the AirDropped Image and whether he knew anything about the picture, and Jazbir said

---

[10] Detective Pagano and Police Officer Dono did not recall whether an incident involving the Singh brothers and a bullet found on a school bus was discussed.  ECF No. 78-21 at 35:9–12, 77:15–78:5; ECF No. 78-22 at 18:25–19:12.

that he did not.  ECF No. 77 ¶¶ 29–30.  Principal Trombetta then asked Jazbir if she could look at his cell phone, and Jazbir refused.  *Id.* ¶ 31.

The parties present diverging accounts of what happened next.  School District Defendants assert that Assistant Principal Flanagan told Jazbir that, if he did not give the school administrators permission to search his phone, they would have to call his father for a meeting.  ECF No. 75-3 ¶ 32.  Principal Trombetta then asked Jazbir if he would be more comfortable speaking with Assistant Principal Flanagan, his assigned assistant principal, alone in a different room.  *Id.* ¶ 33; *see also* ECF No. 76-2 at 138 (34:15–18).  After Jazbir agreed, he and Assistant Principal Flanagan moved to a nearby office.  ECF No. 75-3 ¶ 34.  Assistant Principal Flanagan then asked Jazbir again if he knew anything about the AirDropped Image and if there was anything on his phone that he wanted to show her.  *Id.* ¶ 35.  In reply, Jazbir voluntarily unlocked his cell phone, handed the phone to Assistant Principal Flanagan, and allowed her to scroll through the photos on his phone to confirm that he did not have the AirDropped Image.  *Id.* ¶¶ 36–38.  County Defendants also assert that Jazbir handed over his phone and provided his phone's passcode voluntarily.  ECF No. 78-2 ¶ 14.  Assistant Principal Flanagan did not find the AirDropped Image on Jazbir's phone, but she did find other images and videos that she considered "disturbing," including: pictures of people dressed up in KKK outfits; images of Nazi soldiers with swastikas; an image of a boy at the bottom of a flight of stairs with a caption suggesting the boy was dead because he was a "faggot"; a picture of

8

candy on a table next to a gun with words along the lines of "[w]hen I bring these to school everyone wants to be my friend"; a picture of a student with a Hitler mustache; a picture of a dead squirrel in the grass; and a video of a person on a motorcycle pointing a gun at a police car. ECF No. 75-3 ¶¶ 39–40; *see also* ECF No. 76-2 at 34 (33:4–22). Assistant Principal Flanagan explained to Jazbir that she was concerned about the images on his phone and asked him why he had them, but Jazbir did not respond. ECF No. 75-3 ¶ 43. At her deposition, Assistant Principal Flanagan testified that she believed Jazbir had a flat affect and poor eye contact throughout their conversation. ECF No. 76-2 at 78 (77:11–16). She also stated that Jazbir was not responsive to her questioning and that she was concerned about how Jazbir was processing information cognitively and emotionally, based on her training as a licensed social worker. *Id.* at 48–50 (47:23–49:24).

Plaintiffs, on the other hand, claim that Principal Trombetta told Jazbir that he would be suspended if he did not show the school administrators his phone. ECF No. 77 ¶ 32. In response, Jazbir unlocked his phone and showed his Photos application to Principal Trombetta; one of the Assistant Principals then took the phone out of his hands. *Id.* ¶ 35; ECF No. 78-20 at 37:16–38:21.[11] Jazbir was then

---

[11] Jazbir testified to this sequence of events in his Rule 50-h hearing. In his pretrial deposition, however, Jazbir stated that, in response to Principal Trombetta's assertion about being suspended, he handed over his phone to the principal. ECF No. 78-23 at 101:18–20.

9

sent out of Principal Trombetta's office into another nearby office, and the school administrators kept his phone. ECF No. 77 ¶¶ 33–34; ECF No. 78-20 at 38:22–39:5. Jazbir testified that he was in the separate office without his phone for about an hour or two. ECF No. 78-20 at 39:6–8. Plaintiffs agree that the school administrators did not find the AirDropped Image on Jazbir's phone. ECF No. 77 ¶ 39. They deny, however, that the school administrators saw the "disturbing" images described by Assistant Principal Flanagan on Jazbir's cell phone and claim that the school administrators only found "a video of a Russian man ordering fifteen cheeseburgers at a McDonalds with a gun, and a dirty rap video." *Id.*

In both Plaintiffs' and Defendants' version of events, while Jazbir was in a separate office, Principal Trombetta called Tezbir to her office to discuss the AirDropped Image. *Id.* ¶ 45. Tezbir was escorted from his gym class to her office by a school security guard. ECF No. 28-19 at 37:22–38:4, 39:18–20. Several other school administrators were also in the office, along with Detective Pagano and potentially other police officers, when Tezbir arrived.[12] *Id.* ¶ 47; ECF No. 78-21 at 34:8–17. Principal Trombetta asked Tezbir if he knew anything about the AirDropped Image, and he initially claimed that he had received the image on the bus but that other students thought he had sent it. ECF No. 77 ¶¶ 48–49. The

---

[12] Tezbir testified that only school administrators were present in Principal Trombetta's office. ECF No. 78-19 at 40:21–41:5.

administrative team asked to see the AirDropped Image on his phone, and he claimed that he had already deleted it.  *Id.* ¶ 50.  He then unlocked his phone and showed Principal Trombetta the Photos application on his phone.  *Id.* ¶ 51.  In doing so, Tezbir handed his phone to Principal Trombetta.  *Id.*  School District Defendants claim that the administrative team then asked to see the "Recently Deleted" folder on his Photos application and that, in response, he showed them that his "Recently Deleted" folder was empty.  ECF No. 75-3 ¶ 51.  Plaintiffs, however, deny that the school administrators asked for permission or that Tezbir gave them permission to view his "Recently Deleted" images folder.  ECF No. 77 ¶ 51.  The parties agree that the school administrators did not find the AirDropped Image on Tezbir's phone.  *Id.* ¶ 52.  School District Defendants assert that Principal Trombetta saw a video of someone shooting a drive-through server on Tezbir's phone, ECF No. 75-3 ¶ 52, but Plaintiffs contend that Tezbir did not have this video on his phone, ECF No. 77 ¶ 52. Tezbir testified that, at this point, he asked for his phone back and Principal Trombetta refused to return it to him and that she then kept his phone while he was brought to a nearby office (separate from the office Jazbir was in) so that Principal Trombetta could check on Jazbir.  ECF No. 78-19 at 42:10–43:7, 45:4–7; *see also* ECF No. 77 ¶ 54.

After briefly checking in with Jazbir, Principal Trombetta returned to the office with Tezbir.  ECF No. 77 ¶¶ 54–55.  Soon after, Tezbir admitted that he had created and sent the AirDropped Image.  *Id.* ¶¶ 58–60.  Tezbir testified that he sent

the AirDropped Image as a joke.  ECF No. 78-19 at 26:13–16.  The parties agree that the guns in the AirDropped Image are in fact air guns but that this was not clear from the image.  ECF No. 77 ¶¶ 62–64.  After Tezbir admitted to sending the AirDropped Image, Principal Trombetta returned to her office and informed the police officers that Tezbir had sent the image.  ECF No. 76-2 at 146 (42:6–11).  One of the school administrators then called Amarjit and asked him to come to the school.  ECF No. 77 ¶ 65.

During this time, Assistant Principal Flanagan returned to Principal Trombetta's office to tell her about the photos she saw on Jazbir's phone and learned that Tezbir had admitted to sending the AirDropped Image.  ECF No. 76-2 at 37–19 (36:18–38:17); *see also* ECF No. 75-3 ¶ 66.  According to Assistant Principal Flanagan, she and Principal Trombetta then brought Jazbir back to Principal Trombetta's office, had Jazbir open his phone, and reviewed his photos.  ECF No. 76-2 at 40 (39:8–20).  Principal Trombetta testified that she saw the same images on Jazbir's phone that Assistant Principal Flanagan reported seeing.  *Id.* at 148–49 (44:22–45:3); *see also* ECF No. 75-3 ¶ 67.  Plaintiffs assert that Principal Trombetta only saw a video of "a Russian man ordering fifteen cheeseburgers at a McDonalds with a gun, and a dirty rap video"—the same videos that they assert Assistant Principal Flanagan saw.  ECF No. 77 ¶¶ 66–67.

During the in-school investigation into the AirDropped Image, County Defendants did not ask any questions of either Jazbir or Tezbir.  ECF No. 78-29 ¶ 16.

County Defendants also claim that the police department did not search either Tezbir's or Jazbir's phone during the investigation at the school. *Id.* ¶¶ 14–15. With respect to Tezbir, Plaintiffs do not directly dispute this but assert that County Defendants were present while School District Defendants searched Tezbir's phone. ECF No. 78-29 ¶ 15. With respect to Jazbir, Plaintiffs state that they dispute this but point only to testimony that indicates that police officers were in the room while School District Defendants looked at Jazbir's phone, not that the police officers ever personally looked at Jazbir's phone. *Id.* ¶ 14.

When Amarjit arrived at Sachem North High School, the school administrators showed him the AirDropped Image and told him that Tezbir had sent it to another student. ECF No. 77 ¶¶ 69–70. Principal Trombetta also showed Amarjit images on Jazbir's phone—the content of which is disputed, as discussed above—and the school administrators expressed their concern about the images. *Id.* ¶¶ 77–78. Principal Trombetta testified that, in her opinion, Amarjit did not seem concerned about the images on Jazbir's phone. ECF No. 76-2 at 204–05 (100:25–101:8), 221–22 (117:24–118:9).

Amarjit then spoke with Detective Pagano and gave consent for a member of the Suffolk County Police Department to search his home for weapons. ECF No. 78-29 ¶¶ 19–20. Police Officer Charubin and Amarjit went to the Singh household for this purpose. *Id.* ¶ 21. Police Officer Charubin searched the house and did not find any weapons or other items of concern. *Id.* ¶ 22. After the search, Amarjit

returned to Sachem North High School and to Principal Trombetta's office.  ECF No. 77 ¶ 84.

After Amarjit returned to the school, Principal Trombetta and Assistant Principal Flanagan spoke with Amarjit about sending Jazbir for a psychiatric evaluation based on the images they found on his cell phone.  ECF No. 75-3 ¶¶ 85, 88.  County Defendants also participated in this discussion.  *Id.* ¶ 90.  School District Defendants and County Defendants claim that they only recommended that Jazbir receive an evaluation and that Amarjit consented to the evaluation.  *Id.* ¶ 91; ECF No. 78-29 ¶ 31.  They also claim that Amarjit signed a form titled "Mental Health Assistance Incident Report," which was prepared by Detective Pagano, consenting to the transport of Jazbir for a psychiatric evaluation.  ECF No. 75-3 ¶ 93; ECF No. 78-29 ¶ 31; *see also* ECF No. 75-16.  Plaintiffs, on the other hand, assert that Amarjit insisted that a psychiatric evaluation was not necessary and that any consent that he did give was not voluntary.  ECF No. 77 ¶¶ 92, 94.  Amarjit testified that School District Defendants told him that if Jazbir did not receive a psychiatric evaluation, he would be suspended for five days and that, in response, he said "okay."  ECF No. 78-17 at 44:19–45:2; *see also* ECF No. 78-25 at 32:5–9.  Plaintiffs do not dispute that Amarjit signed the mental health transmittal form for Jazbir but assert that it was not voluntary because Amarjit had insisted that an evaluation was not necessary.[13]

_____

[13] Curiously, while Plaintiffs do not dispute this fact in their response to School District Defendants' and St. Catherine's Statements of Material Facts, *see* ECF No.

ECF No. 77 ¶ 93.    Nevertheless, Plaintiffs do not dispute that School District Defendants "do not have power to compel a student to get a psychiatric evaluation" and that they can "only make a recommendation to a parent that a student should get a psych evaluation." *Id.* ¶¶ 86–87.  The parties agree that Jazbir was ultimately led outside, handcuffed behind his back, placed in the back of a police car, and transported to St. Catherine's by Police Officer Lamonica.  ECF No. 78-29 ¶ 35. Amarjit followed Jazbir to the hospital.  *See* ECF No. 78-25 at 49:8–21.

Around the same time, County Defendants arrested Tezbir as a juvenile for the crime of Falsely Reporting an Incident in the Third Degree, based on the photograph evidence of the AirDropped Image, Tezbir's own admission to sending the image, and the statements of Principal Trombetta and the student on Bus 12 who received the image.  ECF No. 78-2 ¶¶ 24, 29.  Plaintiffs state that they "contest the claim that Tezbir Singh was arrested since under New York law, where a charge is dismissed, the individual is restored to his prearrest status," but do not appear to dispute any of the underlying facts.  ECF No. 78-29 ¶ 24.  To carry out the arrest, Police Officer Dono handcuffed Tezbir behind his back, placed him in the front of a marked police vehicle, and transported him to the Fourth Precinct juvenile room, where he remained from about 11:35 a.m. to 1:00 p.m.  *Id.* ¶¶ 25–26.  At the precinct,

---

77 ¶ 93; ECF No. 76-6 at 63 ¶ 14, they deny that Amarjit signed the form in their response to County Defendants' Statement of Material Facts, *see* ECF No. 78-29 ¶ 31.

Tezbir was issued an Appearance Ticket pursuant to Family Court Act S 307.1. *Id.* ¶ 29; *see also* ECF No. 78-14. Detective Sinclair, as the supervising officer, reviewed the arrest paperwork for Tezbir. ECF No. 78-29 ¶ 32. Amarjit later came to the precinct, where he consented to a police search of both Jazbir's and Tezbir's cell phones. *Id.* ¶¶ 27, 30; *see also* ECF No. 78-10; ECF No. 78-12. Detective Pagano invoiced Tezbir's cell phone and delivered it to Police Officer Gigliotti in the computer crimes section, who later downloaded the device's contents. ECF No. 78-29 ¶¶ 37–38.

Detective Pagano and his supervisors determined that Tezbir should also receive a psychiatric evaluation based on his dissemination of the AirDropped Image. ECF No. 77 ¶ 98; ECF No. 78-21 at 51:10–25. Police Officer Dono then transported Tezbir to St. Catherine's. ECF No. 78-29 ¶ 34. County Defendants assert that Amarjit consented to a psychiatric evaluation for Tezbir and his transport to St. Catherine's, but Plaintiffs dispute this. ECF No. 78-2 ¶ 33; ECF No. 78-29 ¶ 33.

Originally, the Singh brothers were intended to go to Stony Brook University Hospital, but they were diverted to St. Catherine's. ECF No. 76-6 at 63 ¶ 15;[14] ECF No. 76-2 at 158 (54:19–55:12). While at Sachem North High School, Amarjit was told by one of the police officers to follow the police car to the hospital, so he was

---

[14] Citation to ECF pagination followed by internal paragraph number.

able to follow Jazbir to the correct hospital.  ECF No. 78-25 at 44:4–10, 49:8–21.

Principal Trombetta recalled that she and Assistant Principal Flanagan also alerted

Amarjit to the change in hospital, *see* ECF No. 76-2 at 158–59 (54:19–55:6), but

Amarjit did not recall receiving a call from School District Defendants about the

change in hospitals, *see* ECF No. 78-25 at 49:2–5.  School District Defendants

played no role in determining the hospital to which Jazbir and Tezbir were brought.

ECF No. 77 ¶ 95.

   Upon arriving at St. Catherine's, both Singh brothers were met by hospital

employees.  ECF No. 78-29 ¶¶ 34–35.  Amarjit signed general consent for medical

treatment forms for both his sons, allowing them to be admitted.  ECF No. 76-6 at

64 ¶ 19.  Amarjit did not convey to St. Catherine's that he objected to either of his

sons receiving a psychiatric evaluation.  *Id.*  He was also informed by the hospital

that St. Catherine's did not have a children's psychiatry doctor on staff, although the

parties dispute when he was told this.  *Id.* at 64 ¶ 20.

   During their time at St. Catherine's, the Singh brothers stayed in the same

hospital room, which had two beds and a television.  *Id.* at 64 ¶ 21. Jazbir and Tezbir

each received an EKG and possibly had their blood drawn, but they were otherwise

not touched by hospital staff.  *Id.* at 64 ¶ 22.  At no point were they physically

restrained or given any prescription medication.  *Id.* at 64 ¶ 23.  They were given

hospital food[15] and were able to bring in their own food. *Id.* at 65 ¶ 26, 77 ¶ 63. They were also given puzzles and board games for entertainment and were able to watch the television. *Id.* at 64 ¶ 21, 76 ¶ 58, 77 ¶ 64. Amarjit visited Jazbir and Tezbir, along with their mother, Parvinder Kaur, for about eight hours every day they were at St. Catherine's. *Id.* at 77 ¶ 62. John Benedict, who operates a karate studio and ministry and who is close to the Singh family, was also able to visit, as was one of Jazbir's friends. *Id.* at 69 ¶ 36, 77 ¶ 62.

Jazbir and Tezbir were both evaluated by St. Catherine's psychiatrists on January 8, 2019. Jazbir was evaluated by Dr. Maria Benetos, *id.* at 78 ¶ 68, and Tezbir was evaluated by Dr. Kausar Shamim, *id.* at 65 ¶ 27. Dr. Benetos determined that Jazbir required inpatient psychiatric hospitalization, ECF No. 76 at 93 ¶ 73,[16] and Dr. Shamim determined the same for Tezbir, *id.* at 84 ¶ 29–30.[17] Plaintiffs dispute that these conclusions were "justified," but they do not appear to dispute that these were the psychiatrists' determinations. ECF No. 76-6 at 66–67 ¶¶ 29–30, 80 ¶ 73. Dr. Benetos's and Dr. Shamim's conclusions were conveyed to Amarjit and

---

[15] Plaintiffs assert that they were not provided lunch by St. Catherine's on the first day that they were at the hospital, but Amarjit testified that he brought his sons lunch and dinner on that day. ECF No. 76-6 at 65 ¶ 26.

[16] Citation to ECF pagination followed by internal paragraph number.

[17] St. Catherine's Statement of Material Facts, Plaintiffs' response, and the parties' underlying exhibits contain more detailed information about the physicians' evaluations of Jazbir and Tezbir throughout their stay at St. Catherine's. These facts are not necessary to resolve the federal claims and are therefore not included.

Kaur, but they refused to consent to inpatient hospitalization for either of their sons. *Id.* at 68 ¶ 33, 80 ¶ 73. The hospital contacted Child Protective Services because of Amarjit's and Kaur's refusal to agree to inpatient psychiatric hospitalization for Jazbir and/or Tezbir. *See* ECF No. 76-5 at 117.[18]

Because St. Catherine's did not have pediatric psychiatrists on staff, St. Catherine's nurses and staff began to search for an institution that had such psychiatrists that would accept transfer of Jazbir and Tezbir. ECF No. 76-6 at 69 ¶ 34. Nineteen other institutions were contacted over the course of their stay at St. Catherine's. *Id.* at 80–81 ¶ 75. Initially, St. Catherine's could not find a facility that would accept the transfer because the institutions they contacted either had no beds available or would not accept the involuntary transfer of a minor over parental objection. *Id.* at 70 ¶ 45, 80 ¶ 75. Amarjit was informed on January 8, 2019 that the hospital was looking for an institution to accept transfer of Jazbir and Tezbir. ECF No. 78-26 at 206:8–14. He recalled being informed that some of the contacted institutions did not have available beds and did not recall whether he was told that some of the institutions would not accept involuntary transfers of minors. *Id.* at 187:10–19. Jazbir and Tezbir stayed at St. Catherine's until the hospital was able to find a facility that would accept them, and they were ultimately transferred to Sagamore Children's Psychiatric Center ("Sagamore") on January 11, 2019. ECF

---

[18] Citation to ECF pagination.

No. 76-6 at 76 ¶ 59, 90 ¶ 101. While at St. Catherine's, Jazbir and Tezbir were attended to by the hospital's nurses and staff and evaluated by the hospital's psychiatrists. *See* ECF No. 76 at 84 ¶ 27, 87–88 ¶¶ 47–48, 89 ¶ 53, 92 ¶ 68, 96 ¶ 86, 96–97 ¶ 88, 97 ¶ 90.

Dr. Shamim and Dr. Benetos spoke with Principal Trombetta and Assistant Principal Flanagan about Jazbir and Tezbir on January 9, 2019. *Id.* at 88 ¶ 48, 93–94 ¶¶ 77–78; ECF No. 76-2 at 279–82 (31:19–34:14). There is no indication in the record that School District Defendants otherwise communicated with or that County Defendants ever communicated with St. Catherine's about the Singhs. *See* ECF No. 76-6 at 63–64 ¶¶ 16, 18; ECF No. 78-21 at 87:19–88:3; ECF No. 76-2 at 173 (69:10–12), 211 (107:2–5); ECF No. 78-23 at 94:15–23.

After being transferred to Sagamore, Tezbir was evaluated by Dr. Pius Ojevwe, who determined that Tezbir required further observation and assessment. ECF No. 76-6 at 91 ¶¶ 104–05. Tezbir was provisionally diagnosed with unspecified disruptive impulse control and conduct disorder. ECF No. 76 at 101 ¶ 109. Jazbir, meanwhile, was evaluated by Dr. Willing and Dr. Theoharas at Sagamore.[19] *Id.* at 102–03 ¶ 117. He was diagnosed with unspecified disruptive impulse control and conduct disorder, and the Sagamore treatment team recommended to his parents that they follow up with psychiatric and mental health services for Jazbir. *Id.* at 103

---

[19] Dr. Willing's and Dr. Theoharas's first names are not provided by the parties.

¶ 121.  Although Plaintiffs dispute the bases of these opinions, they do not appear to dispute that Tezbir and Jazbir were treated by these psychiatrists or that they received these diagnoses.  *See* ECF No. 76-6 at 91 ¶¶ 104–05; 92 ¶ 109; 94–95 ¶¶ 117–18; 96 ¶ 121.  Tezbir was discharged from Sagamore on January 16, 2019 and Jazbir was discharged on January 18, 2019.  ECF No. 77 ¶¶ 102–03.  On at least one occasion, Amarjit asked Sagamore to release his sons, and the hospital refused to do so.  ECF No. 76-6 at 91 ¶ 104; ECF No. 78-26 at 217:10–218:5.

After their discharge from Sagamore, the Singh brothers saw Debra Terry, a Licensed Clinical Social Worker, for mental health treatment on several occasions between February and May 2019.  ECF No. 76-6 at 97 ¶¶ 126, 128.  Their parents had sought treatment from Terry at the recommendation of Child Protective Services.  ECF No. 78-26 at 222:5–8.  Tezbir stated that he derived no benefit from the treatment with Terry and that he thought the treatment sessions were boring.  ECF No. 76-6 at 99 ¶ 134.  Jazbir likewise did not think that the treatment sessions were necessary and stated that he only saw Terry because his parents suggested it to him.  *Id.* ¶ 135.

Tezbir was suspended from Sachem North High School following the events of January 8, 2019, pending a Superintendent's disciplinary hearing.  ECF No. 77 ¶ 116.  On June 7, 2019, he and the district agreed to settle the disciplinary matter.  *Id.* ¶ 117.

21

### B.    Procedural Background

By way of a Complaint dated January 7, 2020, Plaintiffs commenced this action against Sachem Central School District, Principal Trombetta, Assistant Principal Flanagan, Suffolk County Police Department, St. Catherine's, "John Does 1–10," (unnamed Sachem Central School District employees), and "John Does 11–15" (unnamed Suffolk County Police Department employees), alleging causes of action under 42 U.S.C. § 1983 for violations of the Fourth Amendment and Amarjit's constitutionally protected right to parental liberty, as well as claims under state law. *See generally* ECF No. 1.

On April 11, 2022, Plaintiffs sought leave to file an amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(2), naming as new defendants: Police Officers Kimberly Dono, James Tobin, Theodore Lamonica, Kristopher Charubin, and Tulio Serrata; Detectives Keith Sinclair, Daniel Pagano, and Anthony Gigliotti; and Sergeant Matthew Lundin.  *See generally* ECF No. 45.  Plaintiffs sought to bring causes of action based on alleged violations of the Fourth Amendment under § 1983 against all the newly added Defendants and to add them to the constitutional parental liberty claim and state law claims that had previously been brought against all Defendants.  ECF No. 45-1 at 2.  Plaintiffs attached to their motion a Proposed Amended Complaint (the "Amended Complaint").  ECF No. 45-2.  Defendant Suffolk County Police Department opposed the motion.  *See* ECF No. 46.  Plaintiffs' motion was granted "without prejudice to the Suffolk County

Defendants raising any arguments regarding the timeliness of the amendment in their motion for summary judgment." ECF Order of April 18, 2022.[20]

The Amended Complaint asserts fifty-five causes of action for violations of Jazbir's and Tezbir's Fourth Amendment rights and of Amarjit's constitutionally protected right to parental liberty under § 1983, and for false arrest, false

---

[20] After Plaintiffs' motion to amend the complaint was granted, Plaintiffs failed to file the Proposed Amended Complaint as the Amended Complaint on the docket. Although it would have been better practice to do so, Defendants were nevertheless on notice of the Amended Complaint, as evidenced by their summary judgment filings. *See* ECF Nos. 78-1 & 78-4 (motion for summary judgement from County Defendants attaching the Amended Complaint). Moreover, Defendants have not challenged the adequacy of service of the Amended Complaint. Therefore, the Amended Complaint will be treated as the operative pleading for this case. *Cf. Carr v. City of Norwich*, No. 3:17-CV-0954, 2019 WL 1332770, at *3 (N.D.N.Y. Mar. 1, 2019) (ruling on motion for summary judgment despite procedural shortcoming "in light of the preference and desirability of resolving litigated matters based upon relative merit, rather than on the basis of a procedural or technical default" and because the "defendants do not seek summary judgment on the basis of this shortcoming"), *report and recommendation adopted*, 2019 WL 1331910 (N.D.N.Y. Mar. 25, 2019).

Relatedly, Defendants failed to answer or otherwise respond to the Amended Complaint in accordance with Federal Rule of Civil Procedure 12, instead filing motions for summary judgment. Nevertheless, it is proper to rule on Defendants' motions for summary judgment because there is no indication that Plaintiffs' opposition to the motions would have been any more comprehensive had answers to the Amended Complaint been filed, particularly considering the years of discovery undertaken in this case and the extensive factual record submitted with the motions for summary judgment. *See, e.g.*, *Delphi-Delco Elecs. Sys. v. M.V. Nedlloyd Europa*, 324 F. Supp. 2d 403, 406 n.1 (S.D.N.Y. 2004) ("[T]he [c]ourt need not postpone ruling on a motion for summary judgment where the moving defendant has failed to file an answer if the answer would not clarify the issues raised by the motion or aid the [c]ourt in determining whether there are any genuine issues of material fact that would preclude granting summary judgment.").

imprisonment, assault and battery, intentional infliction of emotional distress, abuse of process, prima facie tort, negligence, medical malpractice, and parental loss of services of a child under state law.  ECF No. 45-2 ¶¶ 123–549.  No party moved to dismiss the Complaint or the Amended Complaint.  Following the completion of discovery, School District Defendants, County Defendants, and St. Catherine's moved for summary judgment, seeking dismissal of Plaintiffs' claims in their entirety.  *See generally* ECF No. 75; ECF No. 76; ECF No. 78.

## II.    Standard of Review

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The court may not resolve issues of fact; rather, the court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them."  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is one that would "affect the outcome of the suit under the governing law."  *Id.*  In other words, "only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. . . .  Immaterial or minor facts will not prevent summary judgment."

*DeFelice ex rel. DeFelice v. Warner*, 511 F. Supp. 2d 241, 245 (D. Conn. 2007) (citing *Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990)).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in [the non-movant's] favor." *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990). After taking the facts in the light most favorable to the non-movant, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The party moving for summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Delphi-Delco Elecs. Sys.*, 324 F. Supp. 2d at 408. This burden is satisfied if the moving party "can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)). If the moving party satisfies his burden, the non-movant must "offer specific evidence showing that a genuine issue for trial exists" to defeat the motion for summary judgment. *Id.* Conclusory allegations are insufficient, and there must be more than "some metaphysical doubt as to the material facts." *See id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "When no rational jury could find in favor of the nonmoving party because the

25

evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

## III.  Discussion

### A.    Statute of Limitations

As an initial matter, County Defendants argue that the § 1983 claims asserted against the individual County Defendants (Police Officers Kimberly Dono, James Tobin, Theodore Lamonica, Kristopher Charubin, and Tulio Serrata; Detectives Keith Sinclair, Daniel Pagano, and Anthony Gigliotti; and Sergeant Matthew Lundin), who were added in the Amended Complaint, must be dismissed because they are barred by the applicable three-year statute of limitations.  ECF No. 78-27 at 19–20.  In response, Plaintiffs argue that the claims asserted in the Amended Complaint were timely because the statute of limitations was tolled by Executive Order No. 202.8, which was enacted on March 20, 2020 by then-Governor Andrew Cuomo in response to the COVID-19 pandemic and extended in a series of subsequently issued executive orders through November 3, 2020.  ECF No. 78-30 at 32–35; *see also* N.Y. Exec. Order No. 202.8; N.Y. Exec. Order No. 202.67.  In reply, County Defendants argue that Plaintiffs cannot rely on the tolling because the statute of limitations would have expired on January 7, 2022, after the executive orders had already expired.  ECF No. 78-31 at 10.

New York and federal courts that have considered this issue have determined that Executive Order No. 202.8 and the subsequent executive orders tolled statutes

of limitations for the time that the executive orders were in place, meaning a statute of limitation's clock stopped running between March 20, 2020 and November 3, 2020 (a total of 228 days). *See McLaughlin v. Snowlift, Inc.*, 185 N.Y.S.3d 212, 213–14 (N.Y. App. Div. 2023); *Doe v. State Univ. of N.Y. Purchase Coll.*, 617 F. Supp. 3d 195, 207–08 (S.D.N.Y. 2022); *see also Brash v. Richards*, 149 N.Y.S.3d 560, 561–63 (N.Y. App. Div. 2021) (finding that the executive orders "constitute a toll" of filing deadlines applicable to litigation in New York courts). The executive orders apply to § 1983 cases. *See Bonilla v. City of New York*, No. 20-CV-1704, 2020 WL 6637214, at *3 (E.D.N.Y. Nov. 12, 2020). Moreover, the tolling applies to a statute of limitations that fell after November 3, 2020, when the executive orders expired. *See McLaughlin*, 185 N.Y.S.3d at 214.

Here, the statute of limitations for the § 1983 claims would have expired on January 7, 2022 in normal course. *See* ECF No. 78-31 at 10. With the tolling, the statute of limitations was extended by 228 days to August 23, 2022. The claims asserted in the Amended Complaint, which was attached to the motion to amend the Complaint that was filed on April 11, 2022 and granted on April 18, 2022, were timely.[21]

---

[21] Because the statute of limitations for the § 1983 claims had not expired when Plaintiffs filed their Amended Complaint, it is unnecessary to address County Defendants' arguments about whether the amended pleadings relate back to the original Complaint. *See* ECF No. 78-27 at 19–20. Additionally, because I ultimately dismiss the state law claims without prejudice, I do not address County Defendants' argument that "any state tort causes of action" are also untimely as to the individual

27

### B.    Individual Versus Official Capacity

Plaintiffs do not state explicitly in the Amended Complaint whether they bring suit against the individual School District Defendants (Principal Trombetta and Assistant Principal Flanagan) and the individual County Defendants in their individual or official capacities.  In the Second Circuit, when the pleadings do not specify whether an official is sued personally, in his official capacity, or in both capacities, courts typically look to "the course of proceedings" to determine "the nature of the liability sought to be imposed."  *Rodriguez v. Phillips*, 66 F.3d 470, 482 (2d Cir. 1995).  More recently, courts in the Second Circuit have assumed that a state official is named in his individual capacity when a complaint is silent as to whether a defendant is named in his individual or official capacity.  *See Santucci v. Levine*, No. 17-CV-10204, 2021 WL 76337, at *9 (S.D.N.Y. Jan. 8, 2021); *Kravtsov v. Town of Greenburgh*, No. 10-CV-3142, 2012 WL 2719663, at *24 (S.D.N.Y. July 9, 2012).

Here, Plaintiffs state in the Amended Complaint that each of the individual County Defendants were "acting within his [or her] capacity . . . with Defendant SUFFOLK COUNTY POLICE DEPARTMENT" at the relevant time and include their professional titles in the case caption, suggesting they may have intended to

---

County Defendants under Section 217-a of the New York Civil Practice Law.  *See id.* at 20.

sue the individual County Defendants in their official capacities. *See* ECF No. 45-2 ¶¶ 16–55. Plaintiffs do not include similar language for School District Defendants. *See id.* ¶¶ 8–11. On the other hand, Plaintiffs seek punitive damages against all Defendants. *See id.* at 85. Punitive damages are generally not available in § 1983 actions unless asserted against defendants in their individual capacities. *See Santucci*, 2021 WL 76337, at *9. Moreover, in their summary judgment briefs, School District Defendants, County Defendants, and Plaintiffs all address whether the individual Defendants are entitled to qualified immunity—a defense that is only available to state officials in their individual capacities, *see Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir. 1988)—suggesting that the parties believe that the individual Defendants are sued in their individual capacities, *see* ECF No. 75-1 at 16–17; ECF No. 77-1 at 31–42; ECF No. 78-27 at 13–14; ECF No. 78-30 at 17–29. Thus, because it appears from the issues raised that Plaintiffs intended to bring suit against the individual Defendants in their individual capacities, the Amended Complaint is interpreted in such a manner. *See Frank v. Relin*, 1 F.3d 1317, 1326 (2d Cir. 1993) (looking beyond the "doctrinal confusion displayed by [plaintiff's] memorandum" and focusing on plaintiff's arguments to determine whether plaintiff should be given opportunity to pursue official-capacity claim). To the extent that Plaintiffs intended to bring suit against the individual School District Defendants and County Defendants in their official capacities, the substance of those claims will be addressed below in the section on municipal liability for Sachem Central School

District and Suffolk County Police Department because "the real party in interest in an official-capacity suit is the governmental entity and not the named official . . . ." *Hafer v. Melo*, 502 U.S. 21, 25 (1991).

## C.    Federal Causes of Action

### 1.    Section 1983

Section 1983 imposes civil liability upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws of the United States. *See* 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). "To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that (1) defendants acted under 'color of state law' (2) to deprive him of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States." *Kraft v. City of New York*, 696 F. Supp. 2d 403, 412 (S.D.N.Y. 2010). As part of this analysis, a plaintiff must show that a defendant was personally involved in the alleged constitutional deprivation. *See Mislin v. City of Townawada Sch. Dist.*, No. 02-CV-273S, 2007 WL 952048, at *7 (W.D.N.Y. Mar. 29, 2007).

### 2.    Qualified Immunity

Qualified immunity can be raised by a party as an affirmative defense to § 1983 claims. *See Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001). In this case, the individual School District Defendants and individual

County Defendants raise the defense of qualified immunity in response to at least some of Plaintiffs' § 1983 claims. *See* ECF No. 75-1 at 16–17; ECF No. 78-27 at 13–14. A municipality may not raise the defense of qualified immunity for its actions, even where the individual officers who acted on the municipality's behalf may do so. *See Vassallo v. Lando*, 591 F. Supp. 2d 172, 198 n.21 (E.D.N.Y. 2008).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The doctrine is intended to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. As a result, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When a defendant invokes qualified immunity to support a motion for summary judgment, courts typically engage in a two-part inquiry: whether the facts shown "make out a violation of a constitutional right" and "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson*,

555 U.S. at 232, 236 (holding that, although this two-step process is "often appropriate," it is not "mandatory"); *see also Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010). Courts in the Second Circuit find a right to be clearly established if: "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)).

Even if a right is clearly established, a state officer is entitled to qualified immunity "if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful," or, in other words, "if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) (first quoting *Taravella*, 599 F.3d at 134; and then quoting *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010)). This inquiry requires consideration of the specific factual situation that the state actor confronted, particularly in the Fourth Amendment context. *See McKinney v. City of Middletown*, 49 F.4th 730, 739 (2d Cir. 2022) ("[O]ur inquiry focuses on the specific 'factual situation the officer[s] confront[ed],' and the defendants will be 'entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.'" (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018))); *see also Saucier*, 533 U.S. at 201

(noting that the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition").

The Supreme Court has also recognized that, in some "rare" and "obvious" cases, "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). In these cases, state officers are not entitled to qualified immunity.

### 3.   Fourth Amendment

Plaintiffs assert causes of action under § 1983 for violations of their rights secured by the Fourth Amendment against the individual School District Defendants and individual County Defendants for the seizure of Jazbir and Tezbir and the searches and seizures of their cell phones during the investigation into the AirDropped Image at Sachem North High School on January 8, 2019. *See* ECF No. 45-2 ¶¶ 123–60.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourteenth Amendment "extends this constitutional guarantee to searches and seizures by state officers, including public school officials." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995) (citations omitted). Generally, for a governmental search or seizure to be constitutional under the Fourth Amendment, the government must have a judicial

warrant supported by probable cause to believe that the searched or seized individual has committed a crime. *Id.* at 652–53; *Bailey v. United States*, 568 U.S. 186, 192–93 (2013). The Supreme Court has recognized a narrow exception to the Fourth Amendment's probable cause requirement "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring)).

In *New Jersey v. T.L.O.*, the Supreme Court recognized that such "special needs" exist in the public-school context and that "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject . . . [and] some modification of the level of suspicion of illicit activity needed to justify a search." 469 U.S. at 340; *see also Vernonia Sch. Dist.*, 515 U.S. at 653. The Court reasoned that requiring school officials to obtain a warrant before searching a student "would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." *T.L.O.*, 469 U.S. at 340. The Court also acknowledged that, in the public-school context, the "privacy interests of schoolchildren" must be balanced against the "substantial need of teachers and administrators for freedom to maintain order in the schools." *Id.* at 341. Consistent with this reasoning, the Court articulated a two-part inquiry to determine whether a search of a student by a school official is reasonable—and therefore permissible—in the public-school setting: the search (1) must be "justified at its

34

inception" and (2) must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 341–42 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1986)).  With respect to the first prong, a search is "'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.*; *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009) ("The lesser standard for school searches could as readily be described as a moderate chance of finding evidence of wrongdoing.").  With respect to the second prong, "[s]uch a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342.

The Supreme Court in *T.L.O.* did not address the question of whether the two-prong analysis applies to seizures of students by public school officials.  The Second Circuit has recognized in dicta, however, that "[c]onstitutional claims based on searches or seizures by public school officials relating to public school students . . . call for an analysis under the Fourth and Fourteenth Amendments that is different from" the law of "warrant and probable cause." *Tenenbaum v. Williams*, 193 F.3d 581, 604, 607 (2d Cir. 1999).  Moreover, other circuit courts and lower courts in the Second Circuit have determined that the *T.L.O.* reasonableness standard applies to seizures of students by school officials for the reasons articulated by the

Supreme Court in *T.L.O.  See Doe ex rel. Doe v. Hawaii Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003); *Hassan ex rel. Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079–80 (5th Cir. 1995); *Edwards ex rel. Edwards v. Rees*, 883 F.2d 882, 884–85 (10th Cir. 1989); *Piechowicz v. Lancaster Cent. Sch. Dist.*, No. 17-CV-00845V(F), 2022 WL 22782841, at *14 (W.D.N.Y. Jan. 18, 2022), *report and recommendation adopted*, 2022 WL 17540648 (W.D.N.Y. Dec. 8, 2022); *Bisignano v. Harrison Cent. Sch. Dist.*, 113 F. Supp. 2d 591, 596–97 (S.D.N.Y. 2000); *see also Wallace ex rel. Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1014 (7th Cir. 1995) (holding that "a teacher or administrator who seizes a student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent").

The Supreme Court in *T.L.O.* also did not address whether the reasonableness standard should apply to school searches "conducted by school officials in conjunction with or at the behest of law enforcement agencies." 469 U.S. at 341 n.7. The Second Circuit has not yet addressed this issue, but other circuit courts have found that the *T.L.O.* reasonableness test applies when school officials initiate a search or seizure and police involvement is minimal and when school officials act in conjunction with—not at the behest of—law enforcement.  *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006) (applying the reasonableness standard articulated in *T.L.O.* to school seizure by law enforcement officers); *Wofford v. Evans*, 390 F.3d 318, 326–28 (4th Cir. 2004) (same); *Shade v.*

*City of Farmington*, 309 F.3d 1054, 1060–62 (8th Cir. 2002) (same for school search by law enforcement officers); *see also Milligan v. City of Slidell*, 226 F.3d 652, 654–55 (5th Cir. 2000) (considering the reasonableness of a school seizure by police officers in light of the "lesser expectation of privacy" enjoyed by students in the school environment without explicitly adopting the *T.L.O.* test). *But see C.B. v. City of Sonora*, 769 F.3d 1005, 1023 (9th Cir. 2014) (declining to decide whether the *T.L.O.* reasonableness standard applied to law enforcement's use of handcuffs on a student in the school setting). District courts in this circuit have also applied the *T.L.O.* standard to determine if searches and seizures conducted by school officials with the assistance of law enforcement officers were reasonable. *See Piechowicz*, 2022 WL 22782841, at *3, *14–15; *N.U. ex rel. Amar v. E. Islip Union Free Sch. Dist.* (*N.U. ex rel. Amar I*), No. 16-CV-4540, 2017 WL 10456860, at *2, *10–11 (E.D.N.Y. Sept. 15, 2017); *Vassallo*, 591 F. Supp. 2d at 193–94; *see also Guan N. v. N.Y.C. Dep't of Educ.*, No. 11-CV-4299, 2014 WL 1275487, at *21 (S.D.N.Y. Mar. 24, 2014) (suggesting that the Second Circuit's decision in *Tenenbaum* "arguably supports a broad reading of *T.L.O.*" and recognizing that "the line separating school discipline from law enforcement activity subject to the warrant requirement is difficult to draw"). As one court has articulated, to hold that the *T.L.O.* standard should not apply in such cases "would potentially discourage school administrators from seeking the assistance and expertise of the police in a school's

effort to address criminal and potentially dangerous situations that may be rapidly unfolding on school property." *Vassallo*, 591 F. Supp. 2d at 194.

Finally, the Supreme Court in *T.L.O.* did not address whether and under what circumstances students can be searched in the absence of individualized suspicion of wrongdoing. In later cases, however, the Court determined that school searches do not always need to be based on individualized suspicion. In *Vernonia School District 47J v. Acton*, the Court upheld a school district's drug testing policy, which subjected all student-athletes to mandatory random drug tests. 515 U.S. at 654–65. In coming to this conclusion, the Court considered that student athletes have a diminished expectation of privacy, that the drug tests were not particularly invasive, that the school had an "important" interest in deterring student drug use, and that the policy "effectively addressed" the problem of drug use at the school. *Id*. at 654–63. Subsequently, in *Board of Education v. Earls*, the Supreme Court held that schools may conduct random drug tests of any student who participates in competitive extracurricular activities. 536 U.S. 822, 830–38 (2002). In reaching this conclusion, the Court considered the nature of the students' privacy interest, the degree of invasion into their privacy interest, and the significance of the school's need for the drug-testing policy. *Id.* Lower courts, applying this balancing test, have since upheld searches of groups of students without individualized suspicion when student safety was at issue. *See, e.g., Thompson v. Carthage Sch. Dist.*, 87 F.3d 979, 982–83 (8th Cir. 1996) (finding that a search of all male students in grades six through

twelve was constitutional in part because school officials had grounds to believe that weapons had been brought to school and because search was minimally invasive); *Brousseau ex rel. Brousseau v. Town of Westerly ex rel. Perri*, 11 F. Supp. 2d 177, 180–83 (D.R.I. 1998) (finding that a search of all students in cafeteria at time when serrated kitchen knife went missing was constitutional in part because of concerns to student safety and because the search was limited to a pat-down of specific areas).

Plaintiffs argue that the Supreme Court's decision in *Riley v. California*, 573 U.S. 373 (2014), should control the analysis of the cell phone searches in this case. *See* ECF No. 77-1 at 18–19. In *Riley*, the Court held that a warrantless search of a cell phone conducted by the police incident to arrest is unconstitutional absent a showing of exigent circumstances. 573 U.S. at 402–03. *Riley* has not been held to apply to searches of students' cell phones carried out by public school officials, however. As the Eleventh Circuit has explained, "*Riley* held only that the exception to the warrant requirement for searches incident to arrest does not extend to searches of information contained in cellphones, and *T.L.O.* held that '[t]he warrant requirement . . . is unsuited to the school environment.'" *Jackson v. McCurry*, 762 F. App'x 919, 927 (11th Cir. 2019) (quoting *T.L.O.*, 469 U.S. at 340). Consistent with this understanding, lower courts have continued to apply the *T.L.O.* framework to searches of students' cell phones conducted by school officials following *Riley*. *See, e.g.*, *Piechowicz*, 2022 WL 17540648, at *7 ("*Riley* was not a school case, and [plaintiff] gives no reason why this [c]ourt can or should supplant *T.L.O.*'s

school-specific inquiry with the constitutional requirements that might apply outside a school's walls.").

### a.    Individual School District Defendants

In the Amended Complaint, Plaintiffs allege that School District Defendants violated Jazbir's and Tezbir's right to be free from illegal searches and seizures under the Fourth Amendment.  ECF No. 45-2 ¶¶ 123–60.  In particular, they argue that Principal Trombetta illegally seized Tezbir and searched his cell phone and that Assistant Principal Flanagan illegally seized Jazbir and searched his cell phone while School District Defendants were investigating the AirDropped Image at Sachem North High School on January 8, 2019.  *Id.*

School District Defendants move for summary judgment on all the Fourth Amendment claims.  They assert that there were no Fourth Amendment violations because Jazbir and Tezbir voluntarily consented to be interviewed by the school officials and to the cell phone searches.  ECF No. 75-1 at 11 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).    In the alternative, School District Defendants argue that the searches and seizures of Jazbir and Tezbir and their cell phones were lawful because, under the circumstances, the school administrators had reasonable suspicion to interview the Singh brothers and to search their cell phones.  *Id.* at 12–15.  Finally, they argue that Principal Trombetta and Assistant Principal Flanagan are entitled to qualified immunity because they did not violate any of Plaintiffs' clearly established constitutional rights.  *Id.* at 16–17.

40

In response, Plaintiffs do not appear to contest that the Singh brothers participated in the in-school interviews voluntarily, but they deny that Jazbir and Tezbir consented to the searches of their cell phones. ECF No. 77-1 at 16–17. Although Plaintiffs acknowledge that both Jazbir and Tezbir initially unlocked their cell phones, they argue that "any claim of voluntariness . . . disappeared" when one of the school administrators grabbed Jazbir's phone from his hands and when Principal Trombetta kept Tezbir's phone after he asked her to return the phone. *Id.* at 17. They also argue that Tezbir never gave Principal Trombetta permission to look in his "Recently Deleted" folder in his Photos application. *Id.* Additionally, Plaintiffs argue that the cell phone searches were illegal under *Riley* because there were no exigent circumstances to justify the searches. *Id.* at 18–19. Moreover, Plaintiffs argue that the searches were unreasonable under *T.L.O.* because Defendants were not genuinely concerned about a school shooting and because "a gun cannot be concealed on a phone." *Id.* at 21–25. With respect to School District Defendants' qualified immunity defense, Plaintiffs assert that "the Supreme Court has held that a warrantless search of a cell phone is per se unreasonable." *Id.* at 31–33. They also argue that, even assuming that the case law surrounding cell phone searches is not sufficiently clear, Principal Trombetta's and Assistant Principal

Flanagan's actions were so "obviously unconstitutional" that no precedent is necessary to find that they are not entitled to qualified immunity. *Id.*[22]

As an initial matter, the parties do not dispute that School District Defendants' in-school interviews of Jazbir and Tezbir and examinations of their cell phones were seizures and searches, respectively, within the meaning of the Fourth Amendment. Consequently, I assume without deciding that the complained-of conduct amounted to seizures and searches governed by the Fourth Amendment.

Turning next to the issue of consent, the parties dispute whether Jazbir and Tezbir consented to the searches of their cell phones.[23]   If Jazbir or Tezbir did voluntarily consent to the search of his cell phone, the Fourth Amendment was not violated as to that search. *See United States v. Garcia*, 890 F.2d 355, 360 (11th Cir.

---

[22] Plaintiffs also argue against the application of the doctrine of qualified immunity more generally, contesting that "[t]he doctrine of modern qualified immunity not only does not derive from the text of the statute, but is actually antagonistic to the language of the statute and the congressional intent underlying the statute." ECF No. 77-1 at 34.  The doctrine of qualified immunity, however, is consistently applied by the Supreme Court and the Second Circuit and is binding precedent on this Court.  *See McKinney*, 49 F.4th at 746 (rejecting argument to deny qualified immunity on public policy grounds because of the "well-settled principles of qualified immunity").

[23] As noted, Plaintiffs do not appear to dispute that Jazbir and Tezbir consented to be interviewed as part of the investigation into the AirDropped Image, and therefore Plaintiffs may have abandoned these claims.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").  Nevertheless, I consider whether the seizures were legal under the *T.L.O.* standard and conclude that they were.

1989) ("One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."). Plaintiffs assert that Jazbir did not consent to the search because he handed his phone to Assistant Principal Flanagan only after she threatened him with suspension, ECF No. 77 ¶¶ 32–38, and that Tezbir did not consent to the search because Principal Flanagan denied his request to return his phone and looked in his "Recently Deleted Photos" folder, which he did not give her permission to do, *id.* at ¶¶ 50–51; ECF No. 78-19 at 45:4–8. Based on these disputed facts, Jazbir and Tezbir may not have consented to the searches of their cell phones. *See Lavin v. Thornton*, 959 F. Supp. 181, 190 (S.D.N.Y. 1997) (consent may be revoked); *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (scope of a consent search may not exceed the scope of the consent given, which is defined by "its expressed object"); *Garcia*, 890 F.2d at 360 ("In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice.").

Accordingly, I turn to whether the in-school interviews and cell phone searches were reasonable in the absence of voluntary consent under the standard articulated in *T.L.O.* The undisputed facts establish that, as a matter of law, the in-school interviews and cell phones searches were justified at the inception. On the day in question, School District Defendants were reasonably investigating what they perceived to be a serious school shooting threat. The previous day, Principal Trombetta learned from a parent that her daughter, a student at Sachem North High

School, had received the AirDropped Image, which depicted two firearms and the words "Don't come to school tomorrow," while she was riding home from school on Bus 12. ECF No. 77 ¶¶ 2–3. School District Defendants were justified in relying on this information—provided by a student through her parent—to initiate an investigation into the incident. *See C.B. ex rel. Breeding v. Driscoll*, 82 F.3d 383, 388 (11th Cir. 1996) (concluding that reasonable grounds for a student search existed where supported by a classmate's tip to school administrators); *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 725 (E.D. Va. 2014) (finding that a student search was justified at the inception based on information that school administrators had received from two parents). Moreover, Assistant Principal Flanagan testified that, upon learning of the AirDropped Image, she was concerned of a possible school shooting. *See* ECF No. 76-2 at 77 (76:9–12). Indeed, it is without dispute that an image of firearms with the words "Don't come to school tomorrow" could be perceived as a threat of a school shooting—Plaintiffs acknowledge that the AirDropped Image could be seen as threatening. ECF No. 77 ¶¶ 62–64, 73, 75–77.[24]

---

[24] Despite acknowledging this, Plaintiffs attempt to argue that School District Defendants and County Defendants did not genuinely believe that there was a threat to school safety and that they "were searching, not for evidence of a gun, but for evidence of a photo to cover themselves because the photo was out in the open and known to the public." *See* ECF No. 77-1 at 22; ECF No. 78-30 at 14. This argument is belied by the record and by common sense. For one, School District Defendants and County Defendants had no need to "cover themselves" in this situation. More importantly, the record as a whole shows that School District Defendants and County Defendants were genuinely concerned about the safety of the school and were working to identify the student who sent the AirDropped Image to ensure student

44

Although Tezbir testified that he sent the image as a joke, ECF No. 78-19 at 26:13–16, School District Defendants did not and could not have known this before speaking with him during the investigation. Thus, School District Defendants had reason to investigate the AirDropped Image.

With respect to the cell phone searches, specifically, School District Defendants had reasonable grounds to believe that the students' cell phones would contain information about the AirDropped Image because the image appeared to be sent from an iPhone using Bluetooth. Plaintiffs argue that the cell phone searches were not reasonable because "a gun cannot be concealed on a phone." ECF No. 77-1 at 25. This argument is unpersuasive, however, because School District Defendants did not need to be looking for a gun for the searches to be proper. School District Defendants were searching the students' cell phones for information about the AirDropped Image—a fact that Plaintiffs acknowledge. *See id.* Because such information would assist School District Defendants in identifying the student who made the perceived school shooting threat, it was appropriate for School District Defendants to search students' cell phones for the AirDropped Image. *Cf. Sabbah*

---

safety. Plaintiffs, in attempting to argue to the contrary, point almost exclusively to actions that Defendants did not take while investigating the AirDropped Image, such as patting down the Bus 12 students and searching their backpacks while they were gathered in the little theater. ECF No. 77-1 at 21–23; ECF No. 78-30 at 12–15. But School District Defendants' and County Defendants' decision not to take such actions does not establish that they were not genuinely concerned about the threat to school safety.

*v. Springfield Sch. Dist.*, No. 19-CV-5564, 2021 WL 2138792, at *6 (E.D. Pa. May 26, 2021) (recognizing that, while the discovery of a "to kill list" in a classroom "was not the same as a student having a weapon at school," this does not "hamstring the school from taking appropriate steps to investigate the list").

Additionally, because iPhones must be near one another to send and receive an image via AirDrop, *see* ECF No. 78-19 at 18:25–19:18, it was reasonable for School District Defendants to focus their investigation on the students who rode on Bus 12. Although School District Defendants did not have reason to suspect that Jazbir or Tezbir sent the AirDropped Image specifically, they did not need individualized suspicion to search the students who rode on Bus 12. Although students generally have a reduced expectation of privacy while in school compared to the public at large, *see Earls*, 536 U.S. at 830–31, Plaintiffs likely maintained some expectation of privacy in their cell phones as personal items brought to school, *see T.L.O.*, 469 U.S. at 339. Nevertheless, Plaintiffs' privacy interest was outweighed by School District Defendants' immediate and compelling interest in maintaining the safety and security of the school and its students. *See Milligan*, 226 F.3d at 655 (recognizing that a school has a "compelling" and "immedia[te]" interest in protecting students and deterring "possibly violent misconduct" that was "due to happen that day"). School District Defendants were investigating what they believed to be a threat of violence against the school, which they had an important interest in preventing. Courts have upheld searches without individualized suspicion when

46

faced with similar concerns over school safety.  *See Thompson*, 87 F.3d at 982–83; *Milligan*, 226 F.3d at 655–56; *Stockton v. City of Freeport*, 147 F. Supp. 2d 642, 646–47 (S.D. Tex. 2001); *Brousseau*, 11 F. Supp. 2d at 180–83.  Indeed, in light of the all-too-frequent and devastating school shootings that our country has experienced in recent years, the Ninth Circuit has observed that "[w]e are hard-pressed to imagine a more important, time-sensitive matter than preventing the unspeakable tragedy of a school shooting."  *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 689 (9th Cir. 2023).  Thus, because the school's interest in maintaining safety outweighed the right of students to be free from in-school interviews and cell phone searches, School District Defendants were permitted to search and seize the students who rode on Bus 12 without individualized suspicion and the interviews of Jazbir and Tezbir and searches of their cell phones were justified at the inception.[25]  *See K.G. ex rel. Doe v. Bd. of Educ.*, No. 5:18-CV-0555, 2022 WL 19692050, at *15 (E.D. Ky. Jan. 19, 2022) ("Courts have held that a search

---

[25] As discussed above, School District Defendants assert that they chose to interview Jazbir and Tezbir before other students on Bus 12 because the Singhs had disciplinary records.  *See* ECF No. 75-3 ¶¶ 22, 25–26.  Plaintiffs dispute that Tezbir had a disciplinary record, and although they acknowledge that Jazbir had previously been disciplined at school for drawing what appeared to be a swastika in a classroom, they argue that Jazbir had drawn a symbol of good luck in his country.  *Id.* ¶¶ 25–25.  While it would have been proper for School District Defendants to consider a student's disciplinary record in deciding which students to interview, *see Phaneuf v. Fraikin*, 448 F.3d 591, 599 (2d Cir. 2006), as explained, they had grounds to interview any of the students on Bus 12, and therefore the disputed facts surrounding Jazbir's and Tezbir's prior disciplinary records are not material.

of a student's cellphone is justified at its inception when there is a threat to student safety.").

Turning to the second prong of the *T.L.O.* standard, it must next be determined whether the in-school interviews and cell phone searches were reasonable in scope. Beginning with the in-school interviews, the undisputed facts establish that the interviews of Jazbir and Tezbir were reasonable in scope. On the day in question, Jazbir and Tezbir were each individually summoned to the front office, where Principal Trombetta's office was located, and then questioned about their knowledge of the AirDropped Image. The interviews were focused on identifying information about the AirDropped Image, and Jazbir and Tezbir were held in the front office only long enough for the school administrators to interview them and to contact their father and await his arrival. *See Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 149 (3d Cir. 2005) (detaining a student to permit school officials to investigate another student's report of serious sexual misconduct and to determine an appropriate punishment was reasonable). Moreover, there is no evidence that any of the school administrators or police officers present raised their voices during the interviews, or that either of the Singh brothers asked to leave the interviews, became emotionally upset during the interviews, or asked to call their parents. *See Mislin,* 2007 WL 952048, at *11 (considering such factors in determining whether an in-school interview was reasonable in scope). These undisputed facts establish that the in-school interviews were reasonable in scope.

48

As to the cell phones searches, however, genuine issues of material fact remain concerning the reasonableness of the scope of the searches.  Beginning with Jazbir, the parties dispute whether Jazbir was present when his phone was searched. Jazbir claims that one of the assistant principals took his phone out of his hands and that the administrative team then held his phone for about an hour or two while he was in a separate room.  ECF No. 77 ¶¶ 32–35; ECF No. 78-20 at 37:16–38:21, 39:6–8.  School District Defendants claim that Assistant Principal Flanagan searched Jazbir's phone after he handed it to her and while he was present.  ECF No. 75-3 ¶¶ 35–38.  Additionally, although the parties disagree about what images were found, the parties agree that Assistant Principal Flanagan and Principal Trombetta looked at images on Jazbir's phone that were clearly not the AirDropped Image.  *See id.* ¶¶ 39–40, 66–67; ECF No. 77 ¶¶ 39, 66–67.  If Plaintiffs' version of the facts is adopted, a reasonable jury could find that the school administrators acted in an overly intrusive manner when they took Jazbir's cell phone out of his hands, sent him into a separate room, and held his phone for an hour or two.  *Cf. N.U. ex rel. Amar v. E. Islip Union Free Sch. Dist.* (*N.U. ex rel. Amar II*), No. 16-CV-4540, 2020 WL 7024309, at *9 (E.D.N.Y. Nov. 30, 2020) (finding that the search of the phone and wallet of a student who made a bomb threat against his school was reasonable in part because the search lasted only a minute-and-a-half and did not involve items "physically removed from [the student's] person").  Additionally, a reasonable jury might find that the school administrators acted unreasonably in scrolling through

Jazbir's photos that were clearly not the AirDropped Image.  *Cf. K.G. ex rel. Doe*, 2022 WL 19692050, at *16 (finding that school administrators' search of a student's cell phone was reasonable in scope in part because "[w]hen they did not find anything [in the student's text messages related to the conduct about which they were concerned], they stopped").

Turning to Tezbir, Plaintiffs claim that Principal Trombetta had Tezbir's cell phone in her possession outside of Tezbir's presence for an extended period of time. ECF No. 78-19 at 42:10–43:7, 45:4–7.  School District Defendants, on the other hand, state that Tezbir handed Principal Trombetta his cell phone and gave her permission to search his phone.  ECF No. 75-3 ¶¶ 50–51.  Drawing all inferences in favor of Plaintiffs, a reasonable jury could find that it was unreasonable to take Tezbir's cell phone into another room for an extended period of time, when Tezbir did not know whether and how his phone was being searched.  *Cf. N.U. ex rel. Amar II*, 2020 WL 7024309, at *9.

Nevertheless, the individual School District Defendants—Principal Trombetta and Assistant Principal Flanagan—are shielded by qualified immunity and therefore cannot be liable for the searches of the Singh brothers' cell phones. *See Safford*, 557 U.S. at 377–79 (finding that a strip search of a student was not reasonable but that the school officers involved in the search were entitled to qualified immunity); *see also Anderson v. Creighton*, 483 U.S. 635, 643–44 (1987) (rejecting the argument that officials alleged to have violated the Fourth Amendment

cannot be protected by qualified immunity).  On the facts of this case, it is not clearly established, and it was not clearly established at the time of the searches at issue, that Jazbir and Tezbir had a right to be free from cell phone searches conducted by public school administrators who were investigating a perceived school shooting threat.

Plaintiffs argue that the individual School District Defendants are not entitled to qualified immunity because the Supreme Court has held that cell phone searches are "per se unreasonable," ECF No. 77-1 at 31–33, but this assertion is incorrect.  In *Riley*, the Supreme Court held that law enforcement may not conduct a warrantless search of a defendant's cell phone incident to arrest absent exigent circumstances. 573 U.S. at 385, 402–03.  The instant case, which involves the search of students' cell phones by school officials in the public-school setting during the investigation into a perceived school shooting threat, is not governed by *Riley*.  *See McKinney*, 49 F.4th at 739 ("Qualified immunity requires consideration of the 'specific factual situation' that the state actors confronted.").  Plaintiffs have not identified any decision by the Supreme Court or Second Circuit addressing the constitutionality of the search of a student's cell phone in the public-school setting, nor has this Court identified any such case.  Indeed, to the contrary, searches of students' cell phones by school administrators investigating threatening and inappropriate student conduct have been upheld by district courts in this circuit on several occasions.  *See Piechowicz*, 2022 WL 17540648, at *7; *N.U. ex rel. Amar II*, 2020 WL 7024309, at

*9. Thus, because there is no precedent that establishes a student's right to be free from cell phone searches in the public-school context, particularly during an investigation into a perceived threat of violence against the school, Principal Trombetta and Assistant Principal Flanagan did not violate a clearly established constitutional right of which a reasonable school official would have known when they searched Jazbir's and Tezbir's cell phones.

Plaintiffs also argue that the school officials' conduct was "so 'obviously' illegal that no 'body of relevant case law' is necessary" to determine that it ran afoul of the Constitution.  ECF No. 77-1 at 32 (quoting *Brosseau*, 543 U.S. at 199). Plaintiffs' argument fails because there is no basis to conclude that the searches at issue were so egregious or "outrageous" that a reasonable school official would know that the searches violated the law even though court decisions have not addressed the issue.  *See Safford*, 557 U.S. at 377–78 ("[O]utrageous conduct obviously will be unconstitutional.").  While investigating a perceived school shooting threat that appeared to be sent from a cell phone, School District Defendants searched the cell phones of two students who were on the bus where the threat was sent.  There is simply nothing about School District Defendants' searches of Jazbir's and Tezbir's cell phones that was "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [them] notwithstanding the lack of [fact-specific] case law."  *Gray ex rel. Alexander*, 458 F.3d at 1307 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th

Cir. 2002)).   Indeed, cases in which obvious constitutional violations have been found involved conduct that is significantly more egregious than the conduct at issue here.  *See, e.g.*, *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020) (denying qualified immunity to an officer who confined an inmate in a cell "covered, nearly floor to ceiling in massive amounts of feces" because "any reasonable officer should have realized that [the] conditions of confinement offended the Constitution" (internal quotation marks omitted)); *Evans v. Stephens*, 407 F.3d 1272, 1283 (11th Cir. 2005) (concluding that the constitutional violation was "obvious" where an officer conducted body cavity searches in a "degrading and forceful manner").   The fact that School District Defendants may have taken Jazbir's and Tezbir's cell phones out of their presence for an extended period does not make their conduct so egregious that no reasonable school official would think they were acting lawfully.   Likewise, it was not so "obviously illegal" for Principal Trombetta and Assistant Principal Flanagan to look at images on Jazbir's phone that were not the AirDropped Image that qualified immunity does not apply.  Accordingly, Principal Trombetta and Assistant Principal Flanagan are entitled to qualified immunity, and their motion for summary judgment is granted as to the Fourth Amendment claims (the first, second, third, and fourth causes of action).

### b.    Individual County Defendants

In the Amended Complaint, Plaintiffs allege that County Defendants violated Jazbir's and Tezbir's right to be free from illegal searches and seizures under the

Fourth Amendment based on the same in-school interviews and cell phone searches as School District Defendants.  ECF No. 45-2 ¶¶ 175–444.  In particular, Plaintiffs assert thirty-six causes of action alleging that each individual County Defendant illegally seized Jazbir, illegally seized Tezbir, and illegally searched each of their cell phones.[26]  *Id.*  Plaintiffs concede that there is not sufficient evidence in the record to sustain these claims against Defendants Tobin, Charubin, Serrata, Sinclair, Lundin, and Gigliotti.  ECF No. 78-30 at 35–36.  Plaintiffs also concede that there is not enough evidence in the record to sustain all but one claim—for the seizure of Jazbir—brought against Defendant Lamonica.  *Id.* at 36–37.  County Defendants' motion for summary judgment is therefore granted with respect to the eleventh through fifteenth, seventeenth through thirtieth, and thirty-fifth through forty-second causes of action.  Plaintiffs' remaining claims allege that Police Officer Lamonica illegally seized Jazbir and that Police Officer Dono and Detective Pagano each illegally seized Jazbir and Tezbir and illegally searched their cell phones.[27]

---

[26] County Defendants argue that these "cut and paste claims" should be dismissed because Federal Rule of Civil Procedure 8 "permits and at times requires the dismissal of a complaint where its length and complexity obscures the function as a notice pleading."  ECF No. 78-27 at 23.  Because Plaintiffs agreed to dismiss the claims for which there was no evidentiary basis, it is not necessary to consider dismissal of these claims on these grounds.

[27] I do not interpret Plaintiffs' Amended Complaint to assert causes of action based on the Fourth Amendment against County Defendants for the arrest of Tezbir or the hospitalization of Jazbir and/or Tezbir at St. Catherine's.  Rather, Plaintiffs appear to assert that the hospitalization of Jazbir and Tezbir at St. Catherine's amounted to false arrest/false imprisonment under state law.  *See* ECF No. 78-30 at 12–17.  To

County Defendants move for summary judgment on the remaining Fourth Amendment claims, arguing that the undisputed facts demonstrate that Jazbir and Tezbir consented to be interviewed and to the searches of their cell phones. *See* ECF No. 78-27 at 8–9. They also assert that the interviews and cell phone searches were carried out only by School District Defendants, not County Defendants, and that the Fourth Amendment claims against County Defendants are therefore meritless. *Id.* at 8–9. Moreover, they argue that the search and seizure of Tezbir's cell phone was constitutional because they had probable cause to arrest him and because "[s]eizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence." *Id.* at 9 (quoting *United Sates v. Babilonia*, 854 F.3d 163, 180 (2d Cir. 2017)).

In opposition, Plaintiffs assert that County Defendants were working jointly with School District Defendants to investigate the AirDropped Image on January 8, 2019 and, in so doing, contributed to the illegal seizures and searches of Jazbir and Tezbir and their cell phones. ECF No. 78-30 at 12–16. Moreover, Plaintiffs argue

---

the extent that Plaintiffs do assert that these actions violated the Fourth Amendment, their claims are considered abandoned because Plaintiffs failed to respond to County Defendants' argument that the Fourth Amendment claims should be dismissed because "the facts are largely undisputed and incontrovertibly establish a basis for probable cause of Tezbir Singh's arrest, and the transport of Jazbir Singh and Tezbir Singh to Saint Catherine of Sienna Medica Center . . . for psychiatric evaluation." ECF No. 78-27 at 8. *See, e.g.*, *Bryant v. Steele*, 462 F. Supp. 3d 249, 270 (E.D.N.Y. 2020) ("A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim.").

that the searches of the Singh brothers' cell phones should be governed by the Supreme Court's decision in *Riley*. *Id.* at 12–13.  Plaintiffs assert that, under *Riley*, County Defendants illegally searched Jazbir's and Tezbir's cell phones because they did not have a warrant and there were not exigent circumstances because "[t]he defendants never, for a moment believed there was the potential for an active shooting." *Id.* at 12–15.  Plaintiffs also assert that County Defendants' argument that Tezbir's cell phone could be seized and searched because it was in plain view is inconsistent with *Riley*. *Id.* at 16.

As an initial matter, the record is unclear as to which County Defendants were present for the interviews of Jazbir and Tezbir and the searches of their cell phones. *See* ECF No. 78-19 at 40:21–41:5 (Tezbir recalled only school administrators being present for his interview); ECF No. 78-20 at 32:3–33:3 (Jazbir recalled a number of police officers were present for his interview but not who specifically); ECF No. 78-21 at 27:4–14, 34:9–17 (Detective Pagano recalled being present for the interviews of Jazbir and Tezbir); ECF No. 78-22 at 17:25–18:7 (Police Officer Dono did not recall which interviews she was present for).  As discussed, to succeed on a § 1983 claim, a plaintiff must show that a defendant was personally involved in the alleged constitutional deprivation. *See Mislin*, 2007 WL 952048, at *7.  Drawing all inferences in favor of Plaintiffs, I will therefore assume that Detective Pagano and Police Officer Dono were present for the interviews of Jazbir and Tezbir and for the

searches of both their cell phones and that Police Officer Lamonica was present for the interview of Jazbir.

As described above, courts have applied the *T.L.O.* standard to determine whether a search or seizure carried out by a school official with assistance from law enforcement was reasonable, particularly where law enforcement's role was minor. *See Piechowicz*, 2022 WL 22782841, at *3, *14–15; *N.U. ex rel. Amar I*, 2017 WL 10456860, at *2, *10–11; *Vassallo*, 591 F. Supp. 2d at 193–94. Here, the record shows that County Defendants' role in the in-school interviews and cell phone searches was minimal. School District Defendants called County Defendants for assistance with the investigation into the AirDropped Image, and School District Defendants led the in-school interviews. *See* ECF No. 78-29 ¶¶ 3, 16. Indeed, Plaintiffs acknowledge that County Defendants did not question Jazbir and Tezbir on January 8, 2019. *Id.* ¶ 16. Moreover, there is no evidence in the record that County Defendants ever conducted a search of either Jazbir's or Tezbir's phone at Sachem North High School. *See* ECF No. 78-21 at 36:11–19, 58:8–19. At most, the record shows that County Defendants were present for the in-school interviews and cell phone searches and may have incidentally seen content on the Singh brothers' cell phones. *See* ECF No. 78-29 ¶¶ 15–16; ECF No. 76-2 at 148 (44:14–17). Plaintiffs attempt to create an issue of fact by pointing to Detective Pagano's testimony that he took Tezbir's cell phone after Amarjit permitted the police department to do so. ECF No. 78-29 ¶ 16 (citing ECF No. 78-21 at 46–47). This

testimony, however, does not create a genuine issue of fact as to whether County Defendants participated in the searches of the cell phones at Sachem North High School, and Plaintiffs do not appear to challenge the legality of County Defendants' seizure of the cell phones after Amarjit permitted the police department to take the phones.   Thus, because the County Defendants played a minor role in the investigation, the *T.L.O.* standard applies in this case.   Accordingly, the conclusion that the in-school interviews did not violate the Fourth Amendment but that the scope of cell phone searches may have been unlawful applies to County Defendants as well as School District Defendants.

It is somewhat unclear from County Defendants' summary judgment brief whether the individual County Defendants raise qualified immunity as a defense to the Fourth Amendment claims.   Plaintiffs argue that County Defendants only assert the defense of qualified immunity for the false arrest/false imprisonment claims, ECF No. 78-30 at 17, and it is true that County Defendants included their qualified immunity discussion in a subsection of their argument on those claims, *see* ECF No. 78-27 at 13–14.   Nevertheless, County Defendants indicate that they are entitled to qualified immunity for their "conduct investigating an extremely serious threat of school violence with guns at a local high school," which includes their conduct during the cell phone searches. *Id.* at 14.   Moreover, several of their arguments about qualified immunity on the false arrest/false imprisonment claims—and Plaintiffs' response to those arguments—are applicable to the Fourth Amendment claims as

58

well.   Specifically, County Defendants argue that their conduct throughout the investigation was not objectively unreasonable and did not violate clearly established law given that they were investigating a threat of school violence.  *Id.* at 13–14.  Plaintiffs, in response, argue that Detective Pagano knew that it was illegal for him to participate in the cell phone searches and that he is therefore not entitled to qualified immunity.   ECF No. 78-30 at 18.   They also argue that County Defendants' actions throughout the investigation were so "obviously illegal that 'no body of relevant case law' is necessary" to establish that the conduct was illegal.  *Id.* at 19 (citing *Haugen*, 543 U.S. at 199).[28]   Accordingly, I will consider these arguments and whether the individual County Defendants are entitled to qualified immunity on the Fourth Amendment cell phone search claims.  *Cf. Simon v. Susice*, No. 19-CV-132, 2021 WL 4295771, at *4 (N.D.N.Y. June 14, 2021) (addressing qualified immunity *sua sponte* in considering a summary judgment motion), *report and recommendation adopted*, 2021 WL 4288509 (N.D.N.Y. Sept. 21, 2021).

The individual County Defendants are entitled to qualified immunity with respect to the cell phone searches.  As discussed, neither the Supreme Court nor the Second Circuit has determined whether the *T.L.O.* reasonableness standard applies

---

[28] As with their opposition to School District Defendants' motion for summary judgment, Plaintiffs also argue against the application of the doctrine of qualified immunity more generally.  ECF No. 78-30 at 20–29.  As discussed above, the doctrine of qualified immunity is well-settled law and will be applied in this case.

to school searches carried out by law enforcement officers or school officials with the assistance of law enforcement officers, but there is precedent from other courts of appeals indicating that such a standard would apply. *See Gray ex rel. Alexander*, 458 F.3d at 1304; *Wofford*, 390 F.3d at 326–28; *Shade*, 309 F.3d at 1060–62; *see also Milligan*, 226 F.3d at 654–55.  A reasonable officer therefore could have believed that he could lawfully participate in a search of a student's cell phone that was carried out by school officials.  Indeed, as noted, cell phone searches carried out by school officials in the presence of police officers have been upheld on numerous occasions in this circuit.  *Piechowicz*, 2022 WL 22782841, at *14–15; *N.U. ex rel. Amar II*, 2020 WL 7024309, at *9.  Even if the individual County Defendants participated more directly in the cell phone searches, they would still be entitled to qualified immunity because the case law is unclear as to whether police officers may conduct warrantless searches of students' cell phones in the public-school setting when investigating a threat of school violence, and thus a reasonable officer could have reasonably believed it was lawful to do so.  Finally, as discussed in the context of School District Defendants, there is no case law establishing that students have an absolute right to be free from cell phone searches in the public-school context more generally.

As with School District Defendants, Plaintiffs argue that County Defendants' conduct was so "obviously illegal that 'no body of relevant case law' is necessary" to determine that the conduct was unlawful.  ECF No. 78-30 at 19 (quoting *Haugen*,

543 U.S. at 199). This argument again fails because there is nothing about County Defendants' role in the cell phone searches that was so egregious or "outrageous" that a reasonable police officer would know that he was acting unlawfully by being present when School District Defendants searched Jazbir's and Tezbir's cell phones. *See Safford*, 557 U.S. at 377–78. County Defendants were assisting with an investigation into a perceived school shooting threat apparently made over a cell phone and, during the course of the investigation, the cell phones of two students who were on the bus where the threat was sent were searched. Even if County Defendants participated in the cell phone searches more directly, this is not the type of conduct to which the "obviously unconstitutional" doctrine applies. *See, e.g.*, *Taylor*, 592 U.S. at 8–9; *Evans*, 407 F.3d at 1283.

Finally, Plaintiffs' argument that Detective Pagano knew that it was illegal for him to participate in the cell phone searches is unsupported by the record. In attempting to make this argument, Plaintiffs state: "Detective Pagano's vigorous insistence that he never viewed the contents of the phone, when juxtaposed with the assertions of the school officials that he did, in fact, review the images, show clearly that Detective Pagano[] knew the illegality of the actions." ECF No. 78-30 at 18. This circular argument is without merit because the school officials did not state that Detective Pagano searched either Jazbir's or Tezbir's cell phone; at most, they stated that he was present when the school administrators searched the cell phones. *See* ECF No. 76-2 at 148 (44:14–17). In any event, even if they had stated that Detective

Pagano searched the cell phones, Detective Pagano's testimony that he had not done so would not "show clearly that [he] knew the illegality of [his] actions." ECF No. 78-30 at 18. Accordingly, Detective Pagano, Police Officer Dono, and Police Officer Lamonica are entitled to qualified immunity, and their motion for summary judgment is granted as to the Fourth Amendment claims (the seventh through tenth, sixteenth, and thirty-first through thirty-fourth causes of action).

### 4. Fourteenth Amendment

Amarjit brings a cause of action against all Defendants based on a violation of his "Constitutional Right of Parental Liberty," alleging that Defendants infringed on this right by removing Jazbir and Tezbir from their parents' custody without probable cause and without any reasonable justification. ECF No. 45-2 ¶¶ 545–49. Although the Amended Complaint does not specify that this claim is brought under the Fourteenth Amendment, the Supreme Court has recognized that the "liberty interest" of parents "in the care, custody, and control of their children" is protected by the Due Process Clause of the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65–67 (2000). Consequently, I interpret this claim to be asserting a violation of Amarjit's substantive due process rights secured by the Fourteenth Amendment.[29]

---

[29] I interpret the Amended Complaint to assert only a substantive due process claim and not a procedural due process claim. Amarjit does not appear to allege that Defendants failed to follow required procedures before he was deprived of his parental rights, such as that he was deprived of the custody of his sons without being

"Government actions that restrict a parent's contact with his child implicate fundamental rights." *Graham v. City of New York*, 869 F. Supp. 2d 337, 349 (E.D.N.Y. 2012). "Choices about marriage, family life, and the upbringing of children are among associational rights the Court has ranked as 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (citation omitted) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971)). Accordingly, the Supreme Court has recognized that the Fourteenth Amendment protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66. The Second Circuit has also articulated that "family members have, in general terms, a substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." *Anthony v. City of New York*, 339 F.3d 129, 142 (2d Cir. 2003) (internal quotation marks and citation omitted).

---

afforded the opportunity to be heard "at a meaningful time and in a meaningful manner," which is the foundation of a procedural due process claim. *See Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Rather, Amarjit appears to argue that Defendants interfered with his right to parental liberty in an arbitrary or conscience-shocking way by causing Jazbir and Tezbir to be hospitalized, which is more consistent with a substantive due process argument.

Substantive due process, in general, guards "against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Tenenbaum*, 193 F.3d at 600 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). To establish that a specific state action violated a substantive due process right, a plaintiff must show that the state action was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id.* "It is not enough that the government act be 'incorrect or ill-advised'; it must be 'conscience-shocking.'" *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Id.* (quoting *Tenenbaum*, 193 F.3d at 600). "To rise to a conscience-shocking level, the misconduct alleged in a substantive due process claim must be either conduct intended to injure in some way that is unjustified by any governmental interest or is inflicted with deliberate indifference in a manner that was shocking under the circumstances." *Swanhart v. Jackson*, No. 20-CV-6819, 2023 WL 4534638, at *11 (S.D.N.Y. July 13, 2023) (internal quotation marks and citation omitted); *see also Miner v. N.Y. State Dep't of Health*, No. 02-CV-3180, 2004 WL 1152491, at *5 (S.D.N.Y. May 24, 2004) (finding the lack of deliberate indifference fatal to the familial association claim of

an inmate whose wife filed for divorce after receiving an inaccurate letter notifying her that her husband was HIV positive).

A parent bringing a substantive due process claim based on the deprivation of the custody or care of a child must establish that there was actual loss of custody of a child. *See Cox*, 654 F.3d at 275–76 ("Where there is no actual loss of custody, no substantive due process claim can lie"); *see also Oglesby v. Eikszta*, 499 F. App'x 57, 60–61 (2d Cir. 2012) (affirming dismissal of substantive due process claim based on right of intimate association because "plaintiffs admit[ted] they never lost custody of any of their children"); *Phillips v. County of Orange*, 894 F. Supp. 2d 345, 380 (S.D.N.Y. 2012) (finding that plaintiffs failed to state a claim for deprivation of substantive due process because they never lost custody of their child). Moreover, "[a]bsent truly extraordinary circumstances, a brief deprivation of custody is insufficient to state a substantive due process custody claim." *Cox*, 654 F.3d at 275. "Such temporary deprivations do 'not result in the parents' wholesale relinquishment of their right to rear their children,' so they are not constitutionally outrageous or conscience-shocking." *Id.* (quoting *Nicholson v. Scoppetta*, 344 F.3d 154, 172 (2d Cir. 2003)).

Additionally, the Second Circuit has held that "a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship." *Gorman v. Rensselaer County*, 910 F.3d 40, 48 (2d Cir. 2018); *see also Calicchio v.*

*Sachem Cent. Sch. Dist.*, No. 14-CV-5958, 2020 WL 264959, at \*12–13 (E.D.N.Y. Jan. 17, 2020) (denying summary judgment to defendants on parental liberty claim where plaintiff testified that he was forced to work for school district without his parents' permission and ordered not to tell his parents).  Accordingly, "[w]here the defendants were motivated by other legitimate interests—rather than an intent to deprive the plaintiff of her rights to associate with her family members—such a claim cannot survive." *Albert v. City of New York*, No. 17-CV-3957, 2019 WL 3804654, at \*3 (E.D.N.Y. Aug. 13, 2019).

### a.    Individual School District Defendants

In the Amended Complaint, Amarjit alleges that all Defendants violated his "constitutionally protected right of parental liberty" by "removing [Jazbir and Tezbir] from their parents' custody without probable cause and without any reasonable justification."  ECF No. 45-2 ¶¶ 545–49.

School District Defendants move for summary judgment on Amarjit's constitutional parental liberty claim, arguing that they "did not separate the Singhs." ECF No. 75-1 at 18.  In particular, they assert that they "did not cause the Singh boys to be hospitalized and did not have the power to determine whether, and for how long, the Singhs stayed in hospital care."  *Id.*

In response, Amarjit argues that School District Defendants "set forth bold-faced [*sic*] lies, and made numerous misrepresentations to the hospital personnel in order to have Jazbir Singh and Tezbir Singh held for psychiatric

66

examinations" over his express objection.  ECF No. 77-1 at 45.  In so arguing, Amarjit points to statements included in the Singh brothers' medical records from St. Catherine's and claims that the statements were provided by School District Defendants and are false.  With respect to Jazbir, Amarjit asserts that School District Defendants falsely informed St. Catherine's that there were "serious concerns about the patient's mood and recent behavior," that it "appeared Jazbir did not want to disclose any information and raised suspicion he was somehow involved," that he had disturbing videos on his phone, that Jazbir "has been emotionally disconnected and flat for some time," that Jazbir's grades had dropped considerably, and that Jazbir was involved in disseminating the AirDropped Image with Tezbir.  *Id.* at 27– 29.  With respect to Tezbir, Amarjit asserts that School District Defendants incorrectly told St. Catherine's that Tezbir had a prior disciplinary incident involving a Nazi sticker, that Tezbir's grades had dropped, that he had been watching violent videos sent by his friends, that Amarjit was teaching Tezbir how to use a "bb" gun, and that Tezbir had been collecting threatening images on his phone for a month. *Id.* at 30–31.

As an initial matter, Amarjit did not lose parental custody of Jazbir and/or Tezbir at any time during their stay at St. Catherine's or Sagamore.  Although Child Protective Services was called while the Singhs were at St. Catherine's, there is no evidence that any steps were ever taken to deprive Amarjit of custody.  Indeed, Amarjit was able to visit his sons every day while they were at St. Catherine's and

Sagamore.  ECF No. 76-6 at 77 ¶ 62.  Thus, because Amarjit did not lose actual custody of his sons, "no substantive due process claim can lie."  *See Cox*, 654 F.3d at 276; *cf. Joyner ex rel. Lowry v. Dumpson*, 712 F.2d 770, 777–78 (2d Cir. 1983) (finding that a temporary transfer of custody pursuant to New York's foster care statute was insufficient to establish a due process violation in part because it did not "result in parents' wholesale relinquishment of their right to rear their children"); *Stollman v. Williams*, No. 20-CV-8937, 2023 WL 6294156, at *15–16 (S.D.N.Y. Sept. 27, 2023) (finding that a temporary separation of child from father for a weekend until a Child Safety Conference could be heard did not give rise to a substantive due process violation).

Moreover, no reasonable jury could find that School District Defendants' actions were outrageous or "conscience-shocking."  *Cox*, 654 F.3d at 275.  Notably, Plaintiffs acknowledge that School District Defendants "do not have the power to compel a student to get a psychiatric evaluation" and that School District Defendants "can only make a recommendation to a parent that a student should get a psych evaluation."  ECF No. 77 ¶¶ 86–87.  Consistent with this authority, School District Defendants recommended that Tezbir receive a psychiatric evaluation after he admitted to sending the AirDropped Image, which was perceived to be a school shooting threat.  This recommendation was not outrageous or conscience-shocking. *Cf. Myslow v. New Milford Sch. Dist.*, No. 3:03-CV-496, 2006 WL 473735, at *13– 14 (D. Conn. Feb. 28, 2006) (concluding that defendants, including school district,

school board, and individual teachers, administrators, and school staff, did not violate plaintiff's right to bodily integrity protected by Fourteenth Amendment by encouraging parents to medicate student for ADHD).

As to Jazbir, although the parties dispute what images the school administrators found on his phone, Plaintiffs acknowledge that School District Defendants found at least a video of "a Russian man ordering fifteen cheeseburgers at a McDonalds with a gun" and "a dirty rap video." ECF No. 77 ¶ 39. Assistant Principal Flanagan also believed Jazbir had a "flat affect," and she was concerned about Jazbir's lack of responsiveness to her questioning. ECF No. 76-2 at 48–50 (47:23–49:24), 78 (77:11–16). She was also concerned about how Jazbir was processing information cognitively and emotionally, based on her training as a licensed social worker. *Id.* at 48–50 (47:23–49:24). Additionally, Principal Trombetta believed that Amarjit was not concerned about Jazbir possessing inappropriate images on his phone. *Id.* at 204–05 (100:25–101:8), 221–22 (117:24–118:9). Based on these concerns and perceptions, the school administrators did not act in a conscience-shocking way when they recommended that Jazbir receive a psychiatric examination. Even assuming School District Defendants told Amarjit that Jazbir would be suspended for several days if he did not receive a psychiatric evaluation, this still does not rise to the level of egregious behavior required to find a constitutional violation considering the concerns that School District Defendants had about Jazbir's mental well-being. *Cf. MC v. Arlington Cent. Sch. Dist.*, No.

11-CV-1835, 2012 WL 3020087, at *5–6 (S.D.N.Y. July 24, 2012) (concluding that defendants, including school district, school board, and teachers, did not violate the Fourteenth Amendment by "taking a student who was not, and had never been, suicidal and sending him to hospital, where a psychiatric record was taken" (internal quotation marks and citation omitted)).

To the extent that the information provided by School District Defendants to St. Catherine's was false or misleading,[30] there is no evidence that the information was provided with "the type of malice needed to shock the conscience." *See Cox*, 654 F.3d at 276 (finding that there was no violation of substantive due process even if school official had provided "exaggerated and misleading" information to Child Family Services, resulting in temporary removal of child). Indeed, several of the statements pointed to by Amarjit as "falsehoods" are merely Principal Trombetta's and Assistant Principal Flanagan's perceptions of and subjective opinions about Jazbir's and Tezbir's moods and behaviors. Other "falsehoods" appear to be facts that were true as to one brother but misattributed to the other. *Cf. Phillips*, 894 F. Supp. 2d at 381 (finding that negligence in handling of child abuse investigation did not "shock the conscience").

---

[30] I make no finding regarding whether the statements attributed to School District Defendants in St. Catherine's medical records would be admissible at trial as an exception to the rule against hearsay. *See* Fed. R. Evid. 802.

Moreover, to the extent that Amarjit argues that School District Defendants improperly pressured St. Catherine's to hold the Singh brothers in a manner that violated the Fourteenth Amendment, there is no evidence in the record that supports this argument. Amarjit attempts to establish that School District Defendants compelled St. Catherine's to hold the Singh brothers by pointing to his own testimony and Jazbir's testimony that they were told by hospital staff that the school had pressured the hospital to keep Jazbir and Tezbir. *See* ECF No. 77 ¶ 89; ECF No. 78-17 at 68:23–69:12, 79:6–19; ECF No. 78-24 at 109:1–112:10. These statements are manifestly hearsay, however, and Amarjit cannot rely on them to oppose School District Defendants' motion for summary judgment without showing that admissible evidence will be available at trial. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985).

In any event, the record is devoid of any evidence that School District Defendants specifically intended to interfere with the Singh's familial relationships when they recommended that Jazbir and Tezbir receive psychiatric evaluations. *See Gorman*, 910 F.3d at 48. Rather, the evidence in the record establishes that School District Defendants were concerned about the safety of the school and its students, as well as the well-being of the Singh brothers, when they recommended that Tezbir and Jazbir receive psychiatric examinations. *See* ECF No. 76-2 at 46–48 (45:22–47:16), 75–76 (74:15–75:14), 184 (80:9–19). Accordingly, School District

Defendants are entitled to summary judgment on Amarjit's parental liberty claim (the fifty-fifth cause of action).

### b.    Individual County Defendants

County Defendants also move for summary judgment on Amarjit's claim for deprivation of parental liberty.  County Defendants argue that the Suffolk County Police Department has no control over St. Catherine's and that the County Defendants were not involved in St. Catherine's decisions about how to treat the Singh brothers.  ECF No. 78-27 at 17–18.  They also argue that Amarjit consented to the psychiatric evaluation of Jazbir and Tezbir and that Tezbir was properly transported to St. Catherine's because he admitted to making a threat of school violence.  *Id.* at 17.

In response, Amarjit argues that County Defendants deprived him of his parental rights by collaborating with the School District Defendants in committing unlawful actions to have the Singh brothers held for examination over his objection. ECF No. 78-30 at 30–31.  Amarjit also disputes that Tezbir was properly transported because he made a threat of school violence, arguing that County Defendants' and School District Defendants' behavior indicates that they "never treated this as a credible threat because it never was."  *Id.* at 30.

County Defendants did not deprive Amarjit of his right to parental liberty protected by the Fourteenth Amendment.  As established above, Amarjit did not lose custody of his sons and so his Fourteenth Amendment claim cannot be sustained.

72

*See Cox*, 654 F.3d at 276.  Even assuming that Amarjit did lose custody, County Defendants did not act in any way that would "shock the conscience."  Construing the facts in the light most favorable to Plaintiffs, Amarjit did not consent to psychiatric evaluations for Jazbir and Tezbir.  *See* ECF No. 78-29 ¶¶ 31–33.  Nevertheless, County Defendants did not shock the conscience when they determined that the Singh brothers should receive psychiatric examinations and subsequently transported them to St. Catherine's.  County Defendants had participated in an investigation into a perceived school shooting threat, and during the course of this investigation, Tezbir admitted to sending the threatening image.  Consequently, it was not outrageous in any sense for County Defendants to decide that Tezbir should receive a psychiatric evaluation.

As to Jazbir, as discussed above, while the parties disagree about what images were found on Jazbir's phone, Plaintiffs acknowledge that School District Defendants found at least "a Russian man ordering fifteen cheeseburgers at a McDonalds with a gun" and "a dirty rap video."  ECF No. 77 ¶ 39.  The school administrators also expressed concern about Jazbir's affect, unresponsiveness, and cognitive and emotional processing and about Amarjit's lack of concern about the images on Jazbir's phone.  ECF No. 76-2 at 48–50 (47:23–49:24), 78 (77:11–16), 204–05 (100:25–101:8), 221–22 (117:24–118:9).  Based on the information available to them at the time, it was not "conscience shocking" for County Defendants to decide that Jazbir should likewise receive a psychiatric evaluation.

To the extent that Amarjit argues that County Defendants' behavior was outrageous because they did not believe there was a credible school shooting threat, this argument is belied by the record, which shows that County Defendants diligently responded to and investigated School District Defendants' report of the AirDropped Image. *See* ECF No. 78-21 at 53:4–9 (testimony from Detective Pagano that he determined the AirDropped Image was "a credible threat").

There is also no indication in the record that County Defendants determined that Jazbir and Tezbir should receive psychiatric evaluations to interfere with the Singh family relations. Rather, the testimony from County Defendants indicates that they brought Jazbir and Tezbir in for evaluations because they believed that the Singh brothers posed a threat to themselves and/or to others and were concerned about their well-being. *See* ECF No. 78-28 at 52:23–53:9, 55:6–18, 58:8–59:6. Indeed, County Defendants told Amarjit that he should follow the police car that was transporting Jazbir to St. Catherine's, which is inconsistent with the notion that they were transporting Jazbir to the hospital to interfere with Amarjit's and Jazbir's relationship. *Cf. Anthony*, 339 F.3d at 143 (finding that police officers' transportation of plaintiff's half-sister to hospital for psychiatric evaluation was not "shocking, arbitrary, and egregious" in part because police officers had attempted to contact plaintiff before the transportation). County Defendants also did not in any way interfere with Amarjit's ability to visit his sons when they were at the hospital. *See Lara-Grimaldi v. County of Putnam*, No. 17-CV-622, 2019 WL 3499543, at *4

(S.D.N.Y. Aug. 1, 2019) (dismissing familial-association claim because plaintiff failed to establish that police officers "specifically intended to interfere with the family relationship" where defendant police officers were stationed in the hospital room of plaintiff's family member but did not obstruct plaintiff from "communicating or otherwise interacting with" her family member).  Because there is no evidence that County Defendants intended to interfere with Amarjit's relationships with his children, they are entitled to summary judgment on the parental liberty claim (the fifty-fifth cause of action).

### c.    St. Catherine's

St. Catherine's[31] also moves for summary judgment on Amarjit's deprivation of parental liberty claim.  St. Catherine's argues that it is entitled to summary judgment on this claim because: Amarjit consented to the evaluation of Jazbir; Tezbir was evaluated because of his Class A misdemeanor; Amarjit signed consent forms for both sons to receive treatment at St. Catherine's; and both Amarjit and his wife had complete access to their sons while they were at St. Catherine's.  ECF No.

---

[31] In its reply brief in support of its motion for summary judgment, St. Catherine's argues that its motion for summary judgment should be granted on the § 1983 claim because it is not a state actor and was not "acting under color of state law."  *See* ECF No. 76-7 at 42–43.  St. Catherine's failed to raise this argument earlier, however, and it is well-settled that new arguments may not be raised in reply briefs.  *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").  Accordingly, I do not consider this argument and assume for the purposes of this motion that St. Catherine's is a state actor.

76 at 185–86.  St. Catherine's also argues that Jazbir and Tezbir were only held at the hospital for several days because their parents refused to consent to a transfer to another facility, which made it harder for St. Catherine's to locate a facility that would accept a transfer of the Singhs.  *Id.*

In response, Amarjit argues that St. Catherine's interfered with his right to parental liberty by refusing to discharge Jazbir and Tezbir after Amarjit had told the hospital that he would "ensure his sons received the appropriate evaluations upon discharge."  ECF No. 76-6 at 57.  Amarjit disputes that Jazbir and Tezbir were held for several days only because he and his wife would not consent to a transfer to a facility with a pediatric psychiatrist, arguing that he was cooperative up until the time that he was told that Jazbir and Tezbir were going to be admitted to an inpatient psychiatric facility and that he told the physicians at St. Catherine's that he would ensure his sons received evaluations if they were discharged.  *Id.*

St. Catherine's did not violate Amarjit's right to parental liberty.  As discussed, Amarjit did not lose custody of his sons during their time at St. Catherine's.  *See Cox*, 654 F.3d at 276.  Indeed, while they were at St. Catherine's, Amarjit was able to visit his sons every day for multiple hours.  ECF No. 76-6 at 77 ¶ 62; *see also Anthony*, 339 F.3d at 143 (citing the fact that "hospital staff accommodated [plaintiff's] interest in staying with [her half-sister at the hospital]" in determining that there was no substantive due process violation).  Thus, Amarjit's Fourteenth Amendment claim cannot be sustained.

Moreover, St. Catherine's conduct was not outrageous or conscience shocking. Upon Jazbir's and Tezbir's arrival at the hospital, St. Catherine's psychiatrists conducted independent evaluations of the Singh brothers and determined that they required further treatment at a facility with a child psychiatrist. ECF No. 76-6 at 65 ¶ 27, 66 ¶ 29, 78 ¶ 68, 80 ¶ 73. There is no evidence that this decision was based on anything other than the psychiatrists' concerns about Jazbir's and Tezbir's mental well-being and the safety of others in their community. *See* ECF No. 76-2 at 310–11 (62:9–63:19); ECF No. 76-3 at 176 (27:914), 179–81 (30:10–32:3). Moreover, the hospital's conduct did not demonstrate "deliberate indifference" towards Amarjit's parental rights "in a manner that was shocking under the circumstances." *Swanhart*, 2023 WL 4534638, at *11. The physicians at St. Catherine's informed Amarjit about their evaluations of his sons and their conclusions that Jazbir and Tezbir required further evaluation, and Amarjit was asked to consent to the inpatient evaluation of his sons, which he chose not to do. ECF No. 76-6 at 68 ¶ 33, 80 ¶ 73. He was thereafter informed of St. Catherine's efforts to find a hospital that could accept the Singh brothers and to relocate them to another hospital. ECF No. 78-26 at 206:8–14.

In any event, there is no evidence in the record that indicates that St. Catherine's acted with the intent to interfere with the Singh family relationships. Rather, as noted, the hospital permitted Amarjit to visit his sons every day and informed him of the physicians' medical determinations that Jazbir and Tezbir

required further examination, which is inconsistent with the notion that St. Catherine's acted with the intent to interfere with Amarjit's relationship with his sons.  *See* ECF No. 76-6 at 77 ¶ 62; ECF No. 78-26 at 206:8–14; *see also Anthony*, 339 F.3d at 143.  Accordingly, St. Catherine's is entitled to summary judgment on the parental liberty claim (the fifty-fifth cause of action).

### 5.    Municipal Liability

Plaintiffs assert causes of action against Sachem Central School District and Suffolk County Police Department for their role in the alleged constitutional violations suffered by Plaintiffs based on theories of municipal liability.

A municipality cannot be held liable under § 1983 on a respondeat superior theory.  In *Monell v. Department of Social Services of City of New York*, the Supreme Court held that "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  436 U.S. 658, 694 (1978).  Thus, "[a] municipality will not be held liable under Section 1983 unless the plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom 'officially adopted and promulgated by that [municipality's] officers.'"  *Abreu v. City of New York*, No. 04-CV-1721, 2006 WL 401651, at *4 (E.D.N.Y. Feb. 22, 2006) (quoting *Monell*, 436 U.S. at 690).  In the Second Circuit, the elements of a *Monell* claim are: "(1) a municipal policy or

custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).  The "policy or custom" requirement may be satisfied under one or more of the following theories:

> (1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of policymaking officials; or (4) a failure by policy makers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with municipal employees.

*Calicchio v. Sachem Cent. Sch. Dist.*, 185 F. Supp. 3d 303, 311 (E.D.N.Y. 2016).

Under the final decision-maker theory, a municipality may be held liable for the decisions or acts of a single official if that official is a decision-maker who "possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  To have final policy-making authority, the official in question must, with respect to the conduct challenged, "be responsible under state law for making policy in that area of the municipality's business or must have the power to make official policy on a particular issue or must possess final authority to establish municipal policy with respect to the action ordered."  *Wang v. Bethlehem Cent. Sch. Dist.*, No. 21-CV-1023, 2022 WL 3154142, at *9 (N.D.N.Y. Aug. 8, 2022) (cleaned up).

Under the failure-to-train theory, a municipality may be liable if the plaintiff shows that his "constitutional injury was the result of a failure to train or supervise that amounts to deliberate indifference to the rights of those with whom the municipality's employees interact." *Gordon v. Niagara Wheatfield Cent. Sch. Dist.*, No. 22-CV-172, 2023 WL 6520216, at *14 (W.D.N.Y. Aug. 22, 2023). However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[A] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "Deliberate indifference is a 'stringent standard of fault,' which requires 'proof that a municipal actor disregarded a known or obvious consequence' of the particular failure in training." *Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 77 (E.D.N.Y. 2015) (quoting *Connick*, 563 U.S. at 61). In order to succeed on this theory of liability, plaintiffs must also show "a specific deficiency in the [municipality's] training program and establish that that deficiency is 'closely related to the ultimate injury' such that it 'actually caused' the constitutional deprivation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quoting *City of Canton*, 489 U.S. at 391).

### a.    Sachem Central School District

Plaintiffs allege that Defendant Sachem Central School District is liable under multiple theories of *Monell* liability.  In the Amended Complaint, Plaintiffs allege that Defendant Sachem Central School District "had a custom and/or policy of seizing cellular telephones from students," which authorized the seizure and search of students' cell phones "even in the absence of criminal activity or probable cause," and that this custom and/or policy caused Jazbir's and Tezbir's cell phones to be searched.  ECF No. 45-2 ¶¶ 161–67.  In their opposition to Sachem Central School District's motion for summary judgment, Plaintiffs argue in particular that Principal Trombetta and Assistant Principal Flanagan were policymakers within the meaning of *Monell* and that the alleged constitutional violations occurred "in this context." ECF No. 77-1 at 43–44.  Plaintiffs also allege that Sachem Central School District failed to train its staff "with respect to the Fourth Amendment rights of students in general, and more particularly when it came to protected information in cellular telephones," and that this failure to train amounted to deliberate indifference to the rights of students and resulted in the searches of Jazbir's and Tezbir's cell phones. ECF No. 45-2 ¶¶ 168–74.

School District Defendants move for summary judgment on Plaintiffs' *Monell* claims.  They argue that there can be no *Monell* liability because there was no constitutional violation.  ECF No. 75-1 at 18.  In the alternative, School District Defendants argue that, even if there had been a constitutional violation, the school

district is not liable because "there is no unconstitutional policy, practice, custom, or act of a final decisionmaker that caused Plaintiffs to suffer such a violation." *Id*. In response, Plaintiffs argue that Principal Trombetta and Assistant Principal Flanagan are policy makers under New York law and, as such, the municipality should be held liable for their actions. ECF No. 77-1 at 42–44. Plaintiffs point to several regulations which they claim establish that Principal Trombetta and Assistant Principal Flanagan had policymaking powers within the meaning of *Monell*. *Id.* at 43–44. In reply, however, School District Defendants assert that none of the cited rules establish that Principal Trombetta or Assistant Principal Flanagan were final decisionmakers or policymakers. ECF No. 79 at 13.

Sachem Central School District cannot be held liable under *Monell* because there is no evidence that indicates that the school district had any policy and/or custom that caused Jazbir and/or Tezbir to be subjected to the potentially unconstitutional cell phone searches. With respect to the final-decision-maker theory of liability, Sachem Central School District cannot be held liable for the searches of Jazbir's and Tezbir's cell phones because Principal Trombetta and Assistant Principal Flanagan, who carried out the searches, did not have "final policymaking authority in the particular area of the municipality's business related to the actions." *Wang*, 2022 WL 3154142, at \*9. New York state law clearly grants policymaking authority over school order and discipline to the Board of Education. At the time of the conduct at issue, New York law provided that the "board of

education of every union free school district shall have power, and it shall be its duty: . . . To establish such rules and regulations concerning the order and discipline of the schools." N.Y. Educ. Law § 1709(2) (McKinney 2011); *see also Baeringer v. Plainview-Old Bethpage Cent. Sch. Dist.*, No. 23-CV-03557, 2024 WL 3161814, at *5 (E.D.N.Y. June 25, 2024) ("New York law grants the Board of Education, not the principal, the power '[t]o establish such rules and regulations [as shall seem proper] concerning the order and discipline of the schools.'" (quoting *Wang*, 2022 WL 3154142, at *11)). The seizure and search of students and their cell phones following a perceived school shooting threat would fall within "the order and discipline of the schools." *See Wang*, 2022 WL 3154142, at *11 ("The authority granted under § 1709 [to the Board of Education] includes authority to enact policies to discipline students for misbehavior or acts that endanger the morals or welfare of others, even where such behavior occurs off campus."). Thus, because the Board of Education has final policymaking authority with respect to the conduct at issue, it cannot be that Principal Trombetta and/or Assistant Principal Flanagan, who are overseen by the Board of Education, have such authority. The statutes that Plaintiffs cite do not alter this analysis because they are irrelevant to the conduct at issue, governing areas such as the performance reviews of classroom teachers, teacher certification, and curricula. *See* ECF No. 79 at 13.

With respect to the failure-to-train theory of liability, Plaintiffs' allegation that the municipality "failed to train its personnel with respect to the Fourth Amendment

rights of students in general, and more particularly when it came to protected information in cellular telephones" is entirely conclusory. ECF No. 45-2 ¶¶ 168–74. The record is devoid of any facts about what training the school district did or did not provide with respect to cell phone searches, and there are no facts in the record that would allow a jury to infer that a lack of training caused any injuries to Plaintiffs. There is also no indication that any failure to train that did occur amounted to deliberate indifference, which requires "proof that a municipal actor disregarded a known or obvious consequence' of the particular failure in training." *See Selvaggio*, 93 F. Supp. 3d at 77 (granting summary judgment to defendants when there was "no evidence to support [p]laintiff's failure-to-train claim with respect to her alleged false arrest" in the "entire record").

To the extent that Amarjit asserts a *Monell* claim against Sachem Central School District in alleging that all Defendants violated his constitutional right to parental liberty, no *Monell* claim can lie against the school district pursuant to § 1983 because there was no underlying constitutional violation committed by the individual School District defendants. *See, e.g.*, *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 498 (E.D.N.Y. 2009) ("[A]s the [c]ourt finds as a matter of law on summary judgment that no constitutional violation was committed against plaintiff by the individual defendants . . . no *Monell* claim can lie against the District or School Board pursuant to § 1983."). In any event, even if such a claim could lie, summary judgment would also be warranted in favor of Sachem Central

School District because Plaintiffs have failed to proffer any evidence of a policy, custom, or failure to train that led to the alleged deprivation of parental liberty. Accordingly, Sachem Central School District is entitled to summary judgment on Plaintiffs' *Monell* claims (the fifth, sixth, and fifty-fifth causes of action).

### b.  Suffolk County Police Department

With respect to Suffolk County Police Department, Plaintiffs allege that the police department has a policy of "accepting at face value anything deemed a 'threat' by school officials" and "defer[ring] to school officials where anything by them is deemed to be a 'threat,'" and that this policy "shows deliberate indifference to the rights of the students" and "led directly to the arrest, detention, and commitment" of Jazbir and Tezbir.  ECF No. 45-2 ¶¶ 445–53.

As an initial matter, County Defendants argue that the Suffolk County Police Department must be dismissed from this suit because it is not a suable entity.  ECF No. 78-27 at 24.  Plaintiffs do not offer any arguments to the contrary.  *See* ECF No. 78-30 at 36.  Indeed, it is well-settled that "[u]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued."  *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002); *see also Paulette v. Suffolk Cnty. 5th Precinct Police Dep't*, No. 22-CV-2913, 2022 WL 2803360, at *3 (E.D.N.Y. July 18, 2022) (dismissing claims against Suffolk County Police

Department because department was a non-suable entity).  Accordingly, Suffolk County Police Department cannot be maintained as a party to this suit.

Plaintiffs request that they be given "leave to amend the caption and the pleadings to reflect the name of the proper entity in this matter, and have the summons and complaint read 'County of Suffolk s/h/a Suffolk County Police Department.'"  ECF No. 78-30 at 36.  To do so would be futile, however, because the record shows that there is no basis for imposing liability against Suffolk County—the record is entirely devoid of any evidence that would support a finding of liability against Suffolk County under *Monell*.

In their summary judgment brief, County Defendants argue that "plaintiff can produce no evidence of a County policy, custom or procedure that lead [*sic*] to or was the proximate cause of the alleged constitutional violation."  ECF No. 78-27 at 18.  Plaintiffs, in response, point to a single statement made by Detective Pagano in his deposition, claiming that he "expressly noted that in conducting the searches in this matter he was following the policies of the Suffolk County Police Department."  ECF No. 78-30 at 31–32 (citing ECF No. 78-21 at 40–42).  But Detective Pagano only stated that he was following Suffolk County Police Department policy when he asked Amarjit if he could search the Singh residence.  *See* ECF No. 78-21 at 42 ("It's just our policy when there is a school incident or a school threat involving a weapon that we ask the residents of the individuals to search their home.").  Given that the

search of the Singh residence is not at issue in the alleged constitutional violation, this statement does not support liability under *Monell* against Suffolk County.

Additionally, Plaintiffs submitted with their opposition to County Defendants' motion for summary judgment a section of the Suffolk County Police Department Rules and Procedures titled "Patrol Operations—Police Response to Incidents Involving the Mentally Disturbed." *See* ECF No. 78-28 at 5. Plaintiffs concede, however, that County Defendants "failed to comply with the policies and procedures set forth by the Suffolk County Police Department," including the provided section, ECF No. 78-29 ¶ 44, so there cannot be *Monell* liability premised on County Defendants' compliance with this policy. As discussed, in order for a municipality to be held liable, Plaintiffs are responsible for showing that the allegedly illegal action was taken "pursuant to" municipal policy. *DeFabio*, 658 F. Supp. 2d at 497. If the individual County Defendants "failed to comply with the policies and procedures" when they committed the alleged illegal actions, they were not acting "pursuant to" Suffolk County policy. *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 122 (2d Cir. 1991) ("In order to establish the liability of [a municipality and its supervisory officials] in an action under § 1983 for unconstitutional acts by [a lower-echelon employee], a plaintiff must show that the violation of his constitutional rights *resulted from* a municipal custom or policy." (emphasis added)). Moreover, the record is entirely devoid of any evidence that the

individual County Defendants' alleged failure to comply with the policy in this case was due to Suffolk County's failure to train its employees.

As with Sachem Central School District, there is also no basis to assert a *Monell* claim against Suffolk County based on Amarjit's parental liberty claim pursuant to § 1983 because there was no underlying constitutional violation. *See, e.g.*, *DeFabio*, 658 F. Supp. 2d at 498. Moreover, even if there had been a constitutional deprivation, there is no evidence in the record that would establish that a Suffolk County policy, custom, or failure to train led to the violation of Amarjit's parental liberty.

Accordingly, Plaintiffs' *Monell* claims against Defendant Suffolk County Police Department are dismissed and, to the extent Plaintiffs' request is a motion for leave to amend the complaint to add Suffolk County as a defendant, the motion is denied as futile. *See Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110–11 (2d Cir. 2001) (noting that courts at the summary judgment stage determine whether a proposed amendment would be futile under the summary judgment standard).

## IV.    State Law Causes of Action

Plaintiffs assert state law claims against all Defendants for false arrest, false imprisonment, assault and battery, intentional infliction of emotional distress, abuse of process, prima facie tort, and negligence and claims against St. Catherine's for

medical malpractice.[32]  ECF No. 45-2 ¶¶ 454–539.  Amarjit also asserts a claim for parental loss of services against all Defendants under state law.  *Id.* ¶¶ 540–44.  Plaintiffs do not oppose Defendants' motions for summary judgment as to the prima facie tort and assault and battery claims.  *See* ECF No. 77-1 at 47–48; ECF No. 76-6 at 57; ECF No. 78-30 at 29–30.  Accordingly, Defendants are entitled to summary judgment on those claims (the forty-sixth and forty-ninth causes of action).

When a district court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over remaining state law claims.  *See* 28 U.S.C. § 1367(c)(3).  "While dismissal of the state law claims is not mandatory, when 'all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point towards declining to exercise jurisdiction over the remaining state-law claims.'"  *DeFelice ex rel. DeFelice*, 511 F. Supp. 2d at 247 (citation omitted) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *see also United Mine Workers v. Gibbs*,

---

[32] Although Plaintiffs do not specify the law under which they bring these claims in in the enumerated causes of action in the Amended Complaint, they clearly state in the first paragraph of the Amended Complaint that these claims are "pendent state claims."  *See* ECF No. 45-2 at 2; *see also* ECF No. 45-3 at 2 (describing that Plaintiffs brought negligence claims and "other tort claims under State law").  Thus, although several of these causes of action could have been brought under § 1983, I interpret these claims to be brought under state law.  *See Hammond v. Long*, 727 F. Supp. 3d 85, 90 n.1 (D. Conn. 2024) (considering the substance of plaintiff's complaint to determine if cause of action was brought under § 1983 or state law).

383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497F, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) ("In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986))).  Having disposed of all federal claims falling within this Court's original jurisdiction, I decline to exercise supplemental jurisdiction over the remaining state law claims.  The state law claims are therefore dismissed without prejudice to their refiling in state court.

## V.    Conclusion

For the foregoing reasons, School District Defendants' motion for summary judgment, ECF No. 75, is granted as to the federal claims and the claims for assault and battery and prima facie tort.  St. Catherine's motion for summary judgment, ECF No. 76, is granted as to the federal claim and the claims for assault and battery and prima facie tort.  County Defendants' motion for summary judgment, ECF No. 78, is granted as to the federal claims and the claims for assault and battery and prima facie tort.  The remaining state law claims are dismissed pursuant to 28 U.S.C. § 1367(c)(3) without prejudice.  The Clerk of the Court is respectfully directed to

enter judgment accordingly and close this case.

**SO ORDERED.**

Brooklyn, New York                              *Edward R. Korman*
June 6, 2025                                     Edward R. Korman
                                                United States District Judge